James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Liaison Counsel for Plaintiff Tiandong Tang*

Maya Saxena (*pro hac vice forthcoming*)
Joseph E. White, III (*pro hac vice forthcoming*)
Lester R. Hooker (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 3334
Telephone: (561) 394-3399

-and-

Steven B. Singer (*pro hac vice forthcoming*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551

*Counsel for Plaintiff Tiandong Tang*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIANDONG TANG, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    v.<br><br>EASTMAN KODAK COMPANY, JAMES V. CONTINENZA, AND DAVID BULLWINKLE,<br><br>                Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tiandong Tang ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by the Eastman Kodak Company ("Kodak" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Kodak's website concerning the Company's public statements; and (d) review of other publicly available information concerning Kodak and the Individual Defendants.

## I.  NATURE OF THE ACTION

1.     This is a federal securities class action against Kodak and certain of its current and/or former officers and directors (collectively, "Defendants") for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired Kodak common stock from July 27, 2020 through August 7, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The action alleges that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price in violation of Sections 10(b) and 20(a) of the Exchange Act.

2.     Kodak is a technology company that provides hardware, software, consumables, and services to customers in commercial print, packaging, publishing, manufacturing, and entertainment. On July 27, 2020, Kodak issued a statement to media outlets based in Rochester,

New York, where it is headquartered, on the imminent public announcement of a "new manufacturing initiative" involving the U.S. International Development Finance Corporation ("DFC") and the response to COVID-19.  Following media publication of Kodak's initial statement about the deal, the Company claimed this information was released inadvertently.

3.     On the same day, to further a scheme to profit from the use of material non-public information about the deal before its official disclosure, Kodak granted its CEO and Executive Chairman, Defendant Jim Continenza, 1.75 million stock options at a conversion price of between $3.03 and $12 per share.  Additionally, the Company awarded 45,000 stock options each to its CFO, Defendant David Bullwinkle, Vice President Randy Vandagriff, and General Counsel Roger Byrd.  On the day these options were awarded, Kodak's stock price closed at $2.62 per share, well below the lowest conversion price, meaning these options were "out of the money" when they were awarded.  That would immediately change to an astronomical degree the very next day.

4.     On July 28, 2020, the price of Kodak's shares jumped 200%, from $2.62 per share on July 27, 2020 to $7.94 per share, following news that the Company had won a $765 million government loan from the DFC under the Defense Production Act ("DPA") to produce pharmaceutical materials, including ingredients for COVID-19 drugs.  Shares continued to surge by over 300% the next day to close at $33.20 per share on July 29, 2020.  This massive stock price increase allowed Defendant Continenza and other Kodak insiders to enrich themselves spectacularly from the compensation scheme, as their stock options were now very much "in the money."  Continenza alone saw the value of his options go from zero to $50 million in just 48 hours.

2

5.      In the days following the deal announcement, details began to emerge revealing the Company's further deception surrounding the compensation scheme.  On August 1, 2020, a *Reuters* article reported new details of the "unusual" 1.75 million option grant to Defendant Continenza.  The article emphasized that the options award "occurred because of an understanding" between Continenza and Kodak's Board of Directors "that had previously neither been listed in his employment contract nor made public."

6.      On this news, Kodak's shares fell $6.91 per share the next trading day, or 32%, from $21.85 per share on July 31, 2020, to $14.94 per share on August 3, 2020.

7.      On August 4, 2020, before the market opened, an article published on *CQ Roll Call* reported that United States Senator Elizabeth Warren submitted a letter to the SEC requesting an investigation of the deal and Kodak for apparent violations of the securities laws and SEC regulations.  The letter noted that on June 23, 2020, Defendant Continenza purchased 46,737 shares and board member Philippe Katz ("Katz") purchased 5,000 shares—stock trades that "raise questions about several different insider trading laws."  According to the letter, each purchase "made while the company was involved in secret negotiations with the government over a lucrative contract raises questions about whether these executives potentially made investment decisions based on material, non-public information derived from their positions," in violation of the Securities Exchange Act of 1934.

8.      Additionally, the letter pointed to the Company's initial July 27, 2020 announcement of the deal to some media outlets, followed by the subsequent frenzy in trading of its shares—a one-day volume of over 1.6 million shares, compared to volume of only 75,000 shares on the previous trading day—as cause for investigation into "how Kodak handled what

3

appears to be 'nonintentional disclosure of material nonpublic information,'" in possible violation of Rule 100 of SEC Regulation FD.

9.     Also on August 4, 2020, according to an article published in the *Wall Street Journal*, the SEC commenced an investigation into "how Kodak controlled disclosure of the loan, word of which began to emerge on July 27, 2020."  The article stated that "[t]he SEC is also expected to examine the stock options granted to executives on July 27," which "instantly became profitable" when Kodak's government loan was announced.

10.    Additionally, on August 4, 2020, Kodak Board member George Karfunkel ("Karfunkel") and his wife Renee Karfunkel disclosed to the SEC a July 29, 2020 donation of 3 million of their 6.3 million Kodak shares to a religious institution in Brooklyn, New York, that he actually founded and controlled, a gift valued at $116.3 million.  Notably, this "charitable" donation took place one day after the DPA loan announcement, the day Kodak's stock peaked, and was provided to a congregation that had only been incorporated since 2018, used a Brooklyn accountant's office as its mailing address, had no website, and for which Karfunkel himself served as the President and Chief Financial Officer—one of only three officers of the purported charity.  One of the other officers was a former Karfunkel company executive who was also an accountant for a Karfunkel family foundation.  The *Wall Street Journal* later reported that, while the organization described itself as an Orthodox Jewish synagogue, in fact it only appeared to have "a small space attached to a three-story apartment building on a quiet side street."  The article also reported that the donation represented the single largest gift recorded to a religious group, and would generate tens of millions of dollars in income-tax benefits for Karfunkel.  A *Mother Jones* article found that the Karfunkels would be able to "pocket a deduction between

4

$52.5 million and $180 million."  Karfunkel's gift is now the subject of an internal review by the Company's outside counsel.

11.     As a result of the revelations on August 4, 2020, the Company's stock price dropped another $0.54, or 4%, from $14.94 per share on August 3, 2020, to $14.40 per share on August 4, 2020.

12.     On August 5, 2020, several Congressional committees sent a joint letter to Defendant Continenza seeking documents about the loan, insider trading, and stock options for their review of "DFC's decision to award this loan to Kodak despite your company's lack of pharmaceutical experience and the windfall gained by you and other company executives as a result of this loan" which raised "questions that must be thoroughly examined."  The committees also sent a document request to the DFC's Chief Executive Officer on the same day, inquiring about the Kodak loan, which the letter noted was "an organization that was on the brink of failure in 2012 and was unsuccessful in its previous foray into pharmaceutical manufacturing."

13.     Finally, in response to increasing public awareness and Congressional and regulatory scrutiny of Kodak's fraudulent scheme, the DFC paused the deal.  On August 7, 2020, after the market closed, the DFC announced, "On July 28, we signed a Letter of Interest with Eastman Kodak.  Recent allegations of wrongdoing raise serious concerns.  We will not proceed any further unless these allegations are cleared."

14.     On this news, the Company's stock price declined $4.15, or 28%, from $14.88 per share on August 7, 2020, to $10.73 per share on August 10, 2020.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.    <u>JURISDICTION AND VENUE</u>

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  The Company is also incorporated in this District.

19.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    <u>PARTIES</u>

20.    Plaintiff Tiandong Tang, as set forth in the accompanying certification, incorporated by reference herein, purchased Kodak common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

21.    Defendant Kodak is a New Jersey corporation with its principal executive offices located in Rochester, New York.  Kodak's securities are traded on the NYSE under the symbol "KODK."

22.     Defendant James V. Continenza ("Continenza") has served at all relevant times as the Chief Executive Officer ("CEO") and Executive Chairman of the Board of Directors of Kodak.

23.     Defendant David Bullwinkle ("Bullwinkle") has served at all relevant times as the Chief Financial Officer ("CFO") and Senior Vice President of Kodak.

24.     Defendants Continenza and Bullwinkle are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Kodak's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Individual Defendants.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background**

25.     Kodak is a global technology company focused on print and advanced materials and chemicals, with its historic basis on photography. Kodak traditionally provides packaging,

functional printing, graphic communications and professional services for businesses around the world.  Its main business segments are Traditional Printing, Digital Printing, Advanced Materials and Chemicals, Brand, and All Other (comprised of the Company's Eastman Business Park technology center and industrial complex).

26.     On May 14, 2020, President Donald J. Trump signed an Executive Order delegating authority to the Chief Executive Officer of the DFC under the Defense Production Act of 1950 to "make loans, make provision for purchases and commitments to purchase, and take additional actions to create, maintain, protect, expand, and restore the domestic industrial base capabilities, including supply chains within the United States and its territories . . . needed to respond to the COVID-19 outbreak."  The Executive Order was enacted to advance "the policy of the United States to further expand domestic production of strategic resources needed to respond to the COVID-19 outbreak, including strengthening relevant supply chains within the United States and its territories."  According to a July 30, 2020 *Bloomberg* article, Kodak officially filed an application for the new program in mid-June.  Form 4's filed with the SEC stated that on June 23, 2020, Defendant Continenza purchased 46,737 shares at an average price of $2.22 per share and Director Katz purchased 5,000 shares at $2.22 per share.

**B.     Defendants' Materially False and Misleading Statements**

27.     On July 27, 2020, Kodak sent a news advisory to several media outlets in Rochester, New York stating there was a "new manufacturing initiative that could change the course of history for Rochester and the American People."  Media reports discussing the statement noted that a press conference would be held the next day with Pentagon officials and that the initiative involved the DFC and the response to COVID-19.  An article published in the

*Wall Street Journal* on July 29, 2020 stated that Kodak told outlets that published the information that it was purportedly for "background only," not publication.

28.     Kodak's announcement and the media reports caused an immediate spike in the Company's trading volume, which reached a volume of 1.65 million shares on July 27, 2020, compared to just under 75,000 shares on the previous trading day.  Kodak's share price increased $0.52 cents, or 24%, from $2.10 per share on July 24, 2020 to $2.62 per share on July 27, 2020.

29.     On July 28, 2020, before the open of the stock market, *RochesterFirst.com* published an article entitled "Kodak lands $765mm federal loan to develop prescription drug ingredients, aims to add 300 jobs in Rochester."  The article stated that "Eastman Kodak Company officials, along with Washington D.C. leaders, announced an agreement for a $765 million federal loan to support the launch of Kodak Pharmaceuticals — a new arm of the company that poses to transform the business into an industry leader in prescription drug manufacturing."  This was the first such loan made under the DPA.  In the article, Continenza stated, "Kodak is proud to be a part of strengthening America's self-sufficiency in producing the key pharmaceutical ingredients we need to keep our citizens safe" and that "[b]y leveraging our vast infrastructure, deep expertise in chemicals manufacturing, and heritage of innovation and quality, Kodak will play a critical role in the return of a reliable American pharmaceutical supply chain."

30.     Later that same day, the DFC announced that its Chief Executive Officer Adam Boehler and Continenza signed a letter of interest ("LOI") for the DFC to provide the $765 million loan to Kodak "to support the launch of Kodak Pharmaceuticals, a new arm of the company that will produce critical pharmaceutical components."  This loan would support the costs needed to repurpose the Company's existing facilities in Rochester, New York and St.

9

Paul, Minnesota to produce pharmaceutical ingredients domestically.  At the press conference announcing the loan, Continenza said: "The new Kodak operations will create over 300 jobs in Rochester, including close to 1200 indirect jobs in its buildout.  We're also going to have approximately 30 to 60 jobs in Minneapolis.  These two regions will greatly benefit from the new economy and the new venture for Kodak moving into the pharmaceutical business."

31.     Although Kodak did not issue its own press release, according to the website *Benzinga*, a Kodak spokesperson stated the "official press release" was published by the DFC, and the Company would not publish its own.  The DFC press release stated that the LOI's signing indicated "Kodak's successful completion of DFC's initial screening and will be followed by standard due diligence conducted by the agency before financing is formally committed."

32.     In a *Wall Street Journal* article published the same day, Continenza said that the loan must be repaid over 25 years.  Continenza also said that under the deal, Kodak would produce "starter materials" and "active pharmaceutical ingredients" used to produce generic medicines. Continenza also touted the Company's existing readiness for the shift to pharmaceuticals, stating, "We have a long, long history in chemical and advanced materials— well over 100 years," and that Kodak's existing infrastructure allowed the Company "to get up and running quickly."

33.     On July 29, 2020, Continenza appeared on CNBC's *Squawk Box*, where he discussed the deal.  When asked if the loan was a "done deal," Continenza responded: "We feel very comfortable that we can bank on it.  We have some work to do. . . . We feel very comfortable we're gonna get to the end game.  We signed a letter of interest.  ***We've been working on this for a few months.***  We feel very comfortable we're gonna get to the end game

10

or we wouldn't be probably sitting here."  In response to a question about the extremely high

trading volume on July 27 and whether word about the deal had gotten out, Continenza replied,

"I don't know.  I mean, obviously this has been a pretty tight kept secret, obviously, even until

the last day, basically.  I couldn't tell you what influenced [the volume] or didn't."  After the

interviewer commented that it didn't look like the deal was "a well-kept secret," Continenza said,

***"Well, we knew for over a week."***

34.     On the same day Continenza gave this interview, Form 4's filed with the SEC

stated that on July 27, 2020, Kodak granted Continenza 1.75 million stock options at a

conversion price of between $3.03 and $12 per share.  Additionally, the Company awarded

45,000 stock options each to its CFO David Bullwinkle, Vice President Randy Vandagriff, and

General Counsel Roger Byrd at the same conversion prices.

35.     Over a three-day period, immediately after the stock option awards, Kodak's

stock price shot up over 1,000%, an increase of $30.58 per share, from $2.62 per share on July

27, 2020, to $33.20 per share at the close of trading on July 29, 2020.  At one point during

trading on July 29, 2020, the stock reached a high of $60.00.  The value of Continenza's stock

options shot up to $50 million in a few short days.  Similarly, the other executives saw their

options increase in value individually to $1.2 million for options below the money when issued.

Additionally, Continenza and Katz' June 23 stock purchases, made while Kodak was negotiating

the deal, were worth about $1.5 million and $166,000, respectively, at the close of trading on

July 29.

36.     The statements referenced in ¶¶27-35 were materially false and/or misleading

because they misrepresented and failed to disclose material information pertaining to the

Company's business and operations, which were known to Defendants or recklessly disregarded

by them.  Specifically, Defendants failed to disclose that the Company had granted Defendant Continenza and several other Company insiders millions of dollars' worth of stock options, immediately prior to the Company publicly disclosing that it had received a $765 million loan from the DFC to produce drugs to treat COVID-19, which Defendants knew would cause Kodak's stock to immediately increase in value once the deal was announced.  In addition, while in possession of this material non-public information, Defendant Continenza and other Company insiders purchased tens of thousands of the Company's shares immediately prior to the announcement, again at prices that they knew would increase exponentially once news of the loan became public.  As a result of the foregoing, Defendants' statements about Kodak's business, operations, and prospects were false and misleading and/or lacked a reasonable basis when made. As a result of this fraudulent scheme, Defendants artificially inflated the Company's stock price throughout the Class Period and made investment decisions based on material, non-public information derived from their positions at Kodak.

### C.    The Truth Begins to Emerge

37.    On August 1, 2020, a *Reuters* article reported new details of the "unusual" 1.75 million option grant to Continenza.  The article stated that according to "a person familiar with the arrangement," the options award "occurred because of an understanding" between Continenza and Kodak's Board of Directors "that had previously neither been listed in his employment contract nor made public."  Further, "The decision to grant Continenza options was never formalized or made into a binding agreement, which is why it was not disclosed previously."  Concurrently, market observers questioned why Kodak, historically a technology company, had been selected for a DPA loan related to pharmaceutical supplies over companies with more experience in the pharmaceutical industry.

12

38.     In reaction to the news, Kodak's stock price plummeted $6.91 per share, to close at $14.94 on August 3, 2020—a decline of over 34% per share.

39.     As public scrutiny of the deal increased, government officials and the SEC also took action.  On August 4, 2020, before the market opened, an article published on *CQ Roll Call* reported that Senator Elizabeth Warren submitted a letter to the SEC requesting an investigation of the deal and Kodak for apparent violations of securities laws and an SEC regulation. Specifically, the letter noted that Continenza and Katz' June 23, 2020 stock purchases "raise questions about several different insider trading laws."  According to the letter, each purchase "made while the company was involved in secret negotiations with the government over a lucrative contract raises questions about whether these executives potentially made investment decisions based on material, non-public information derived from their positions," in violation of the Securities Exchange Act of 1934.

40.     The letter also pointed to the Company's initial July 27, 2020 announcement of the deal to some media outlets, followed by the subsequent frenzy in trading of its shares—a one-day volume of over 1.6 million shares, for a stock that averaged only 236,000 shares traded per day in 2019—as cause for concern about "how Kodak handled what appears to be 'nonintentional disclosure of material nonpublic information,'" in possible violation of Rule 100 of SEC Regulation FD.  The letter also stated that following the July 27 disclosure, by SEC regulation the Company should have fully disclosed the deal to investors.  But Kodak "made no such full disclosure . . . Instead, 'the company asked the reporters to remove the information after they posted it.'"

41.     Also on August 4, 2020, according to an article published in the *Wall Street Journal*, the SEC commenced an investigation into "how Kodak controlled disclosure of the

13

loan, word of which began to emerge on July 27, 2020."  Additionally, the article stated that "[t]he SEC is also expected to examine the stock options granted to executives on July 27," which "instantly became profitable" when Kodak's government loan was announced.

42.     Additionally, on August 4, 2020, Kodak Director Karfunkel and his wife Renee Karfunkel filed a Schedule 13D with the SEC disclosing their July 29, 2020 donation of 3 million of their 6.3 million shares to Congregation Chemdas Yisroel based in Brooklyn, New York, a purportedly religious organization that Karfunkel actually founded, controlled, and personally benefited from.  Using the average of the stock's high and low that day of $38.75, the gift was worth $116.3 million, an amount representing "the single largest gift recorded to a religious group."  On August 11, 2020, the *Wall Street Journal* published an article entitled, "Kodak Insider Makes Well-Timed Stock Gift of $116 Million to Religious Charity He Started." The article emphasized that the congregation had only been incorporated in 2018, and used a Brooklyn accountant's office as its mailing address.  While the organization described itself in its state registration statement "as an Orthodox Jewish synagogue that conducts religious services, classes, lectures and seminars," in fact it only appeared to have "a small space attached to a three-story apartment building on a quiet side street."  Significantly, Karfunkel was listed in securities filings as the charity's President, and is one of only three officers at the charity.  The organization's registration also listed as its Secretary "a former executive of a Karfunkel company who is listed as the accountant for the Karfunkels' family foundation in federal tax filings."  The article further emphasized that the donation took place on July 29, 2020—one day after the DPA loan announcement and the day that Kodak's stock reached its recent high—and that Karfunkel stood to receive tens of millions of dollars in income tax benefits.  A *Mother Jones* article observed that, since the congregation is a tax-exempt organization, the Karfunkels

14

"will be able to claim this donation as a tax deduction" and "pocket a deduction between $52.5 million and $180 million." Karfunkel's gift is now the subject of an internal review by the Company's outside counsel.

43.     In total, Kodak's stock price plummeted over $29 per share over four trading days, falling from $33.20 per share at opening on July 29, 2020 to closing at just $14.40 per share on August 4, 2020—a decline of over 57% as a result of Defendant's fraudulent actions.

44.     On August 5, 2020, several House Congressional committees—the Select Subcommittee on the Coronavirus Crisis, the Committee on Financial Services, and the Committee on Oversight and Reform—sent a joint letter to Continenza seeking documents about the loan, insider trading, and stock options for their review of "DFC's decision to award this loan to Kodak despite your company's lack of pharmaceutical experience and the windfall gained by you and other company executives as a result of this loan raise questions that must be thoroughly examined." The committees also sent a document request to the DFC CEO Adam Boehler on the same day inquiring about the loan supporting Kodak, "an organization that was on the brink of failure in 2012 and was unsuccessful in its previous foray into pharmaceutical manufacturing."

45.     In a letter to the SEC dated August 5, 2020, United States Representative Maxine Waters, Chairwoman of the House Financial Services Committee, and other members of Congress expressed "serious concerns arising from a series of securities transactions engaged in by [Kodak], its executive officers and its board members," that occurred "at, or around the time Kodak learned it could be eligible to receive a $765 million [DPA] loan." The letter also said Continenza's stock options were "issued under unusual circumstances" and "based on some peculiar and unwritten 'understanding,'" and that Continenza and Katz' June stock purchases

"[m]ost concerningly . . . were made prior to the DPA loan becoming public information, but while Kodak was in discussions regarding the loan."

46.     Most recently, on August 7, 2020, the Company issued a press release announcing the appointment of a special committee of its Board of Directors who would "oversee an internal review of recent activity by the Company and related parties in connection with the announcement of a potential loan by the U.S. International Development Finance Corporation to support the launch of Kodak Pharmaceuticals." According to *Dow Jones*, Karfunkel's gift of 3 million shares to a religious institution is included in this review.

47.     On the same day, after close of trading, the DFC announced: "On July 28, we signed a Letter of Interest with Eastman Kodak. Recent allegations of wrongdoing raise serious concerns. We will not proceed any further unless these allegations are cleared." On this news, shares of Kodak dropped another 28%, from $14.88 per share at close of trading on August 7, 2020, to $10.73 per share on August 10, 2020.

## V.     CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Kodak common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Kodak and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

16

49.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Kodak's securities were actively traded on the NYSE, an open and efficient market, under the symbol "KODK."  Millions of Kodak shares were traded publicly during the Class Period on the NYSE. As of July 24, 2020, Kodak had approximately 44 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Kodak and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Kodak;

d)   whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Kodak;

e)   whether the market price of Kodak common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)   the extent to which the members of the Class have sustained damages and the proper measure of damages.

53.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.   UNDISCLOSED ADVERSE FACTS

54.   The market for Kodak's securities was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, Kodak's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise

18

acquired Kodak's securities relying upon the integrity of the market price of the Company's securities and market information relating to Kodak and have been damaged thereby.

55.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Kodak's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

56.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Kodak's financial well-being and prospects.

57.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

VII.   <u>LOSS CAUSATION</u>

58.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Kodak's

securities and operated as a fraud or deceit on Class Period purchasers of Kodak's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Kodak's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Kodak's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

59.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Kodak's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Kodak to conceal the truth.

60.     Defendants' false and misleading statements had the intended effect and caused Kodak's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

61.     The decline in the price of Kodak's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Kodak's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

the prices of Kodak's securities and the subsequent decline in the value of Kodak's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

62.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

63.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Kodak, their control over, receipt and/or modification of Kodak's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Kodak, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

64.     At all relevant times, the market for Kodak's securities was an efficient market for the following reasons, among others:

> a)     Kodak securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;
>
> b)     As a regulated issuer, Kodak filed periodic public reports with the SEC and the NYSE;

    c)     Kodak securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

    d)     Kodak regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

65. As a result of the foregoing, the market for Kodak's securities promptly digested current information regarding Kodak from all publicly available sources and reflected such information in Kodak's stock price. Under these circumstances, all purchasers of Kodak's securities during the Class Period suffered similar injury through their purchase of Kodak's securities at artificially inflated prices and a presumption of reliance applies.

66. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Kodak's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.   NO SAFE HARBOR

67.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

68.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Kodak who knew that the statement was false when made.

## XI.   CLAIMS AGAINST DEFENDANTS

### COUNT I
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

70.     During the Class Period, Kodak and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kodak securities; and (iii) cause Plaintiff and the other members of the Class to purchase Kodak securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

71.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Kodak securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Kodak, as alleged herein.

72.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

73.     Kodak and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Kodak as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Kodak's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Kodak and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Kodak's securities during the Class Period.

74.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and

performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

75.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Kodak's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Kodak securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Kodak shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants

during the Class Period, Plaintiff and the other members of the Class acquired Kodak securities during the Class Period at artificially inflated high prices and were damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Kodak, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Kodak securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, Kodak and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     The Individual Defendants were and acted as controlling persons of Kodak within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

83.    As set forth above, Kodak and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

28

    c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

    d)      Awarding such other relief as this Court deems appropriate.

## XIII.  **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: August 13, 2020

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

*/s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

***Liaison Counsel for Plaintiff Tiandong Tang***

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 3334
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

-and-

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606

29

Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

***Counsel for Plaintiff Tiandong Tang***