*NOT FOR PUBLICATON*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TIANDONG TANG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EASTMAN KODAK COMPANY, JAMES V. CONTINENZA, and DAVID BULLWINKLE,<br><br>Defendants. | Civil Action No. 3:20-cv-10462-FLW-ZNQ<br><br>**OPINION** |

<u>**WOLFSON, Chief Judge:**</u>

Plaintiff Tiandong Tang sues Eastman Kodak Company ("Kodak"), James Continenza, and David Bullwinkle (collectively, "Defendants"), individually and on behalf of others similarly situated, for securities violations arising from a $765 million government loan to Kodak to manufacture COVID-19 drugs. Before the Court are three motions to be lead plaintiff[1] and a motion to transfer this matter to a different venue. For the following reasons, I find that the Western District of New York is the most appropriate forum, and decline to decide the lead plaintiff motions.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  *Defendants' Course of Conduct*

---

[1]      The following parties withdrew their lead plaintiff motions: Doug Atkin, *see* ECF No. 26; Broward Motorsports Holdings LLC, *see* ECF No. 16; Gary Eberhard, *see* ECF No. 20; Alexander Enciso, *see* ECF No. 33; Scott Reynolds and SRR Fortress Capital LLC, *see* ECF No. 22; Fred and Elaine Khachi, Sasan Payvar, Dina Yaghmai, and Domenic Pesce, *see* ECF No. 34; Kevin Harte and Alfred Fenelle, *see* ECF No. 35; Margaretha Welkhammer, *see* ECF No. 25; and Daniel, Paul, and Mary Ann Yannes, *see* ECF No. 32.

Kodak is a software and consumables company incorporated in New Jersey and headquartered in Rochester, New York. *See* Compl., ¶ 1.[2] On July 27, 2020, Kodak alerted media in Rochester to a "new manufacturing initiative that could change the course of history for Rochester and the American people." *See id.* ¶¶ 2, 27. According to Kodak, it meant to send the alert as "background only," but inadvertently omitted that caveat, so local news reported it to the public. *Id.* ¶ 27. A trading frenzy ensued: investors moved 1.65 million shares that day, up from 75,000 previously. *Id.* ¶ 28. At the very same time, and unbeknownst to the public, Kodak's Board of Directors allegedly gave CEO James Continenza and CFO David Bullwinkle together 1.8 million stock options, convertible at a price between $3 and $12. *See id.* ¶¶ 3, 5, 34. Kodak's shares closed at $2.62, making the options instantly profitable. *Id.* ¶ 3.

On July 28, 2020, before trading began, RochesterFirst.com broke news of a $765 million loan from the United States International Development Finance Corporation ("DFC"), which Kodak would use to manufacture ingredients for COVID-19 drugs, the first of its kind under the Defense Production Act ("DPA").[3] *See id.* ¶ 4, 28. DFC signed a formal Letter of Interest ("LOI") that day, with financing subject to final due diligence, and held a press conference with Kodak officially announcing the deal. *Id.* ¶ 30. Continenza apparently told the Wall Street Journal that, despite never successfully manufacturing pharmaceuticals before, Kodak has "a long, long history in chemical and advanced materials—well over 100 years," and could "get up and running quickly." *Id.* ¶ 32.

---

[2]    I accept all facts in the Complaint as true for the purposes of this motion. I also consider "affidavits, depositions, stipulations, or other documents containing facts that would tend to establish the necessary elements for a transfer." *See Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756-57 (3d Cir. 1973).

[3]    Kodak filed a loan application with DFC in mid-June 2020, pursuant to an executive order that delegated authority to DFC to "make loans . . . to create . . . industrial capabilities . . . needed to respond to the COVID-19 outbreak." *See* Compl., ¶ 26.

On July 29, 2020, Continenza appeared remotely on a CNBC show called Squawk Box, broadcast from New York City, to discuss the loan. *Id.* ¶ 33. When asked if it was a "done deal," he purportedly responded: "We feel very comfortable that we can bank on it." *Id.* When asked about the high trading volume on July 27, 2020, he continued: "I mean, obviously this has been a pretty tight kept secret . . . even until the last day, basically." *Id.* And when the interviewer observed that the deal did not look that way, he admitted: "Well, we knew for over a week." *Id.* Kodak's shares closed at $33.20, up 1,000% from two days earlier.

Questions began to surface almost as quickly as the stock rose. On August 1, 2020, Reuters reported the "unusual" option grant. Quoting "a person familiar with the arrangement," the grant "occurred because of an understanding" between Continenza and the Board of Directors "that had previously neither been listed in his employment contract nor made public." *See id.* ¶¶ 5, 37. Kodak shares fell by $6.91 on the news. *Id.* ¶ 6. Then, on August 4, 2020, the website CQ Roll Call reported a letter from Senator Elizabeth Warren asking the SEC to investigate Kodak's dealings with the DFC. According to that letter, Continenza purchased 46,737 shares [at $2.22] on June 23, 2020, "while the company was involved in secret negotiations with the government over a lucrative contract," which "raises questions about whether [he] potentially made investment decisions based on material, non-public information." *Id.* ¶ 7. Senator Warren also questioned Kodak's allegedly inadvertent disclosure on July 27, 2020, which set off a chaotic trading day, and its decision to "ask[ ] reporters to remove the information" rather than reveal the deal to investors. *Id.* ¶¶ 8, 39-40.

On August 4, 2020, the Wall Street Journal revealed a nascent SEC investigation into "how Kodak controlled disclosure of the [DFC] loan." *Id.* ¶ 9. According to the Journal, "[t]he SEC is also expected to examine the stock options granted to executives" that same day. *Id.* Likewise, the

Journal reported a $116.3 million gift from Kodak Board member George Karfunkel to Congregation Chemdas Yisroel, "a small space attached to a three-story apartment building" in Brooklyn, which he founded. Karfunkel made the donation on July 29, 2020, the day Kodak's share price peaked. *Id.* ¶ 42. It was "the single largest [gift] recorded to a religious group." *Id.* A subsequent article in Mother Jones found that Karfunkel likely would "pocket a deduction between $52.5 and $180 million" because of the synagogue's tax-exempt status. As a result, Kodak's shares closed at $14.40, down $29 since news of the option grant emerged three days earlier. *Id.* ¶ 11.

On August 5, 2020, "[s]everal Congressional committees" sent a joint letter to Continenza regarding "DFC's decision to award [the $765 million] loan to Kodak despite your company's lack of pharmaceutical experience and the windfall gained by you and other company executives." *Id.* ¶ 12. The letter called Continenza's option grant "concerning" because the Board made it "prior to the DPA loan becoming public information, but while Kodak was in discussions regarding the loan." *Id.* ¶ 45. On August 7, 2020, DFC rescinded its LOI, citing "[r]ecent allegations of wrongdoing." *Id.* ¶ 13. Kodak responded with a press release announcing a special committee to "oversee an internal review of recent activity by the Company . . . in connection with the . . . loan." *Id.* ¶ 46. Kodak's shares traded at $10.73 following these developments. *Id.* ¶ 14. Finally, on August 11, 2020, on a call to discuss second quarter finances, Continenza "repeatedly referred to the loan as a 'potential loan,'" in contrast to his more confident statements on Squawk Box, allegedly causing Kodak stock to fall to $9.72.

B. *The Present Litigation and Pending Motions*

On August 13, 2020, Tang filed this putative class action on behalf of all persons who acquired Kodak common stock between July 27, 2020, and August 7, 2020, the class period. *Id.* ¶ 48. Tang alleges that Kodak's shares traded at artificially high prices because Defendants

misleadingly disclosed facts about the DFC loan. Tang also alleges that Continenza and Bullwinkle profited from material nonpublic information because the Board gave them stock options (convertible up to a much higher share price) before announcing the deal, on the near-certain knowledge that Kodak's value would soar as soon as the public became aware of the loan. *Id.* ¶¶ 54, 66. Tang brings suit pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. §§ 78j(b), 78t(a). A substantially similar action is pending in United States District Court for the Southern District of New York. *See McAdams v. Eastman Kodak Company et al.*, No. 20-06861.

Tang published notice of his Complaint in Globe Newswire one day after filing it. *See*15 U.S.C. § 78u-4(a)(3)(A)(i). Class members could move to be lead plaintiff by October 13, 2020. Twelve did so, but after most withdrew, three remain: Charles Satterwhite, Terry Butler, and Yiqi Woodling (collectively, "Satterwhite Group"); Les Investissements Kiz. Inc. and UAT Trading Service, Inc. (collectively, "Kiz Group"); and John McMullan. *See* ECF Nos. 18, 29, 31; *supra*, note 1. Kiz Group also filed a transfer motion arguing that the Southern District of New York ("SDNY") is a more convenient forum. *See* ECF Nos. 53, 59. Only Satterwhite Group opposes, and it seeks to keep this matter in the District of New Jersey. *See* ECF No. 57. McMullan has not indicated a preference. Neither has Tang, who is not a New Jersey resident although he filed here. Defendants do not appear to object to transfer. *See* ECF No. 54. This Opinion decides Kiz Group's transfer motion only, leaving the resolution of the lead plaintiff motions to the sound discretion of the transferee court.

*C. The Transfer Motion*

Kiz Group moves to transfer because "many of the operative facts occurred [in SDNY]," in particular "numerous key statements and disclosures" relating to the option grant and DFC loan. Pl. Br. I, at 1-2.[4] Kiz Group also contends that "the public interest weighs in favor of transfer given court congestion in [New Jersey]."[5] *Id.* Satterwhite Group opposes. In their view, Kiz Group relies on "the irrelevant fact that Kodak's stock is traded on the [New York Stock Exchange]" to tie this matter to SDNY. *See* Pl. Br. II, at 5. Satterwhite Group also argue that Kiz Group bootstraps venue to the place where certain media outlets reported Defendants' statements and omissions, when in fact venue is most appropriate where Defendants actually made them. *Id.* at 6. Based on the parties'

---

4    Surprisingly, Kiz Group does not attach declarations, exhibits, or supporting documents to its transfer motion. But they make a number of assertions in their briefings that are inconsistent with their position to transfer to SDNY. The same is true of Satterwhite Group's opposition, which at various times represents WDNY as a more appropriate forum than New Jersey. In this narrow circumstance, I may rely on uncontested concessions in the parties' briefs even though they do not constitute pleadings. *See, e.g.*, *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993) ("Representations made in briefs inform opposing parties and the court of concessions, the specific contentions being raised and the facts and laws relied upon to make them. The smooth, efficient working of the judicial process depends heavily upon the assumption that such representations will be made after careful, deliberate evaluation by skilled attorneys who must ultimately accept responsibility for the consequences of their decisions. It goes without saying that one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so, and under the circumstances here, a reviewing court may properly consider the representations made in the [ ] brief to be binding."); *Tlapanco v. Elges*, No. 15-2852, 2017 WL 4329789, at *6 (S.D.N.Y. Sept. 14, 2017) (finding, on a transfer motion, that § 1404(a) neither "suggests nor requires the conclusion that a district court may not satisfy the requirements of that clause—i.e. acquire the power to transfer a case—by relying on the parties' representations and concessions").

5    Additionally, Kiz Group raises the first-filed rule, under which district courts may "enjoin subsequent prosecution of proceedings involving the same parties and the same issues already before another district court," *See Equal Emp't Opportunity Comm'n v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988); *Crosley Corp. v. Hazeltine Corp.*, 122 F. 2d 925, 929 (3d Cir. 1941) ("In all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it.") (quoting *Smith v. McIver*, 22 U.S. 532, 535 (1824)), and "consolidate similar cases by transferring later-filed cases." *See Emps.' Ret. Sys. of City of St. Petersburg, Fla. v. Teva Pharm. Indus. Ltd.*, No. 19-2711, 2019 WL 5485549, at *3 (E.D. Pa. Oct. 8, 2019); *Osborne v. Emp. Benefits Admin. Bd. of Kraft Heinz*, No. 19-00307, 2020 WL 1808270, at *4 (W.D. Pa. Apr. 9, 2020) (same). The first-filed rule does not warrant transfer to SDNY because this matter *is* the first-filed action. *See Palagano v. NVIDIA Corp.*, No. 15-1248, 2015 WL 5025469, at *1 (E.D. Pa. Aug. 25, 2015) ("The first-filed rule counsels deference to the suit that was filed first."). And venue determinations are traditionally made by the court presiding over the case filed first, as here. *See One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.*, 987 F. Supp. 317, 329 (D.N.J. 1997); *FMC Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, 751 (E.D. Pa. 2005).

briefings, which raise the Western District of New York ("WDNY") as extensively as SDNY and New Jersey, I consider that forum as well, even though Kiz Group does not specifically request a transfer there.[6]

## II.    LEGAL STANDARD

28 U.S.C. § 1404(a) permits a court to transfer a federal action from one district to another "[f]or the convenience of parties and witnesses, in the interest of justice," as long as the transferee court is one in which the action could have been brought originally. This inquiry requires an "individualized, case-by-case consideration of convenience and fairness." *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Huang v. Sonus Networks, Inc.*, No. 15-2407, 2016 WL 1090436, at *2 (D.N.J. Mar. 21, 2016). As such, courts consider various private and public interest factors. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The burden to justify transfer rests with the movant, *id.*, who must "show the proposed alternative forum is not only adequate, but also more appropriate than the present forum." *Hoffer v. Infospace.com, Inc.*, 102 F. Supp. 2d 556, 572 (D.N.J. 2000). Because § 1404(a) is designed to

---

6       The Third Circuit has not expressly decided whether a court may *sua sponte* transfer a case under § 1404(a). *Cf. Amica Mutual Insurance Co. v. Fogel*, 656 F.3d 167, 180 (3d Cir. 2011) (implicitly affirming district court's decision to do so); *Lafferty v. Gito St. Riel*, 495 F.3d 72 (3d Cir. 2007) ("Section 1404(a) transfers are *discretionary* determinations made for the convenience of the parties.") (emphasis added). Nevertheless, district courts have frequently exercised such authority. *See, e.g.*, *Meyers v. Heffernan*, No. 10-212, 2012 WL 1133732, at *5 (D. Del. Mar. 29, 2012) ("A Court's authority to transfer cases pursuant to 28 U.S.C. § 1404(a) does not depend upon a motion, stipulation, or consent of parties to the litigation."); *Ziemkiewicz v. R+L Carriers, Inc.*, No. 12-1923, 2013 WL 505798, at *1 (D.N.J. Feb. 8, 2013) ("Because this Court has jurisdiction and venue is proper, this Court has the authority to *sua sponte* transfer this case pursuant to 28 U.S.C. § 1404(a)."); *Bank Express Int'l v. Kang*, 265 F. Supp. 2d 497, 507 n.12 (E.D. Pa. 2003) ("Although no party has requested it, we may transfer venue under § 1404(a) *sua sponte*."); *Bent Glass Design v. Scienstry, Inc.*, No. 13-4282, 2014 WL 550548, at *6 (E.D. Pa. Feb. 12, 2014) ("[W]hile venue is initially reliant on a plaintiff's preference as reflected in the pleadings, a district court may upon motion or *sua sponte* dismiss or transfer a civil action to any other district in the interest of justice and/or for the convenience of parties and witnesses."). Based on that authority, under the transfer statute, I may transfer a case to a venue discussed in the parties' briefings but not specifically requested by the movant in its motion. *See* 28 U.S.C. § 1404(a) (providing the authority to "*any*" district where an action could have been filed, if in the convenience of the parties and interests of justice) (emphasis added).

"protect litigants, witnesses and the public against unnecessary inconvenience and expense," courts will not grant transfer lightly. *Infanti v. Mandalay Bay Resort & Casino*, No. 13-6934, 2014 WL 1430368, at *3 (D.N.J. Apr. 14, 2014) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)). This is especially so in securities cases, because "the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum." *See Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985).

## III.   DISCUSSION

### A. *Where This Matter Could Have Been Brought Originally*

A court reviewing a transfer motion must first determine whether the action could have been brought in the transferee district. *See Shutte v. Armco Steel Corp.*, 431 F.2d 22, 23-24 (3d Cir. 1970); *Cadapult Graphic Sys. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 564 (D.N.J. 2000); *In re USA Techs., Inc. Sec. Litig.*, No. 18-13759, 2019 WL 4785780, at *2 (D.N.J. Sept. 30, 2019) (calling this a "threshold" issue). Three statutory provisions might establish venue in this case: 28 U.S.C. § 1391(a), 28 U.S.C. § 1391(b), and 15 U.S.C. § 78aa. Under § 1391(a), an action may be brought in any district "in which any defendant resides, if all defendants are residents of the State in which the district is located." *Id.* According to the residency allegations in the pleadings, Kodak is headquartered in Rochester, New York, and WDNY is a proper venue to that extent. Kiz Group does not address this provision in any event.

Additionally, under § 1391(b), an action may be brought in any district "in which a substantial part of the events or omissions giving rise to the claim occurred." *Id.* Kiz Group assumes, without ever demonstrating, that SDNY is a proper venue for this reason. Sutterwhite Group does not appear to specifically challenge that presumption. However, it is well-settled that acts or omissions must be more than tangentially related to a forum to qualify as "substantial." *See*

*Dollar Discount Stores of America, Inc. v. Petrusha*, No. 01-384, 2001 WL 881725, at *1 (E.D. Pa. Apr. 25, 2001); *Cottman Transmission Systems, Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994) ("Events or omissions that might only have some tangential connection with the dispute in litigation are not enough."). Substantiality under § 1391(b) turns on the "the location" of the events giving rise to the claim, not forum "contacts" in the context of personal jurisdiction. *Cottman*, 36 F.3d at 295. For the reasons discussed *infra*, this provision does not support venue in SDNY, but does in WDNY.

Finally, pursuant to 15 U.S.C. § 78aa, securities actions "may be brought . . . in the district wherein the defendant is found or is an inhabitant or transacts business," or where any fraudulent and material act occurred. *Id.* Venue is proper in WDNY under this provision because Defendants performed numerous acts or omissions there, *see infra*, which form the basis of Tang's Complaint. *See Bath Industries, Inc. v. Blot*, 427 F.2d 97, 114 (7th Cir. 1970) ("[A]ll that is required is but one act within the forum district which represents more than an immaterial part of the alleged illegal events."); *CIBC World Markets, Inc. v. Deutsche Bank Sec., Inc.*, 309 F. Supp. 2d 637, 646 (D.N.J. 2004) (same). Pursuant to § 78aa, venue also appears to be proper in SDNY because Continenza allegedly conveyed misleading information to media outlets there, such as the Wall Street Journal, and Kodak (or its officials) released similar statements to the press, which made their way to audiences in SDNY. *See, e.g.*, *Mitchell v. Texas Gulf Sulphur Company*, 446 F.2d 90, 106 (10th Cir. 1971) (venue proper in Utah under § 78aa because defendants, *inter alia*, released a "false and fraudulent" press release to the media, which came to Salt Lake City on the Dow-Jones broad tape and in the Wall Street Journal); *In re AES Corporation Securities Litigation*, 240 F. Supp. 2d 557, 559 (E.D. Va. 2003) (venue proper in Indiana under § 78aa because defendant disseminated press releases containing misleading statements over the business wire, which reached a national

audience); *In re Triton Limited Securities Litigation*, 70 F. Supp. 2d 678, 686-87 (E.D. Tex. 1999) (venue proper in the Eastern District of Texas under § 78aa because defendant sent misleading press releases into the district); *Eades v. Boston Technology*, No. 95-7236, 1996 WL 668403, at *3 (E.D. Pa. Nov. 13, 1996) (venue proper in the Eastern District of Pennsylvania under § 78aa because defendant transmitted press releases containing allegedly false information into the district); *S-G Securities, Inc. v. Fuqua Investment Company*, 466 F. Supp. 1114, 1121 (D. Mass. 1979) (venue proper in Massachusetts under § 78aa because Wall Street Journal reported the substance of defendant's press releases, thereby transmitting them into the district); *Oxford First Corporation v. PNC Liquidating Corporation*, 372 F. Supp. 191, 197 (E.D. Pa. 1974) (Becker, J.) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district . . . the nature and function of a press release is to diffuse information."); *CIBC World Markets*, 309 F. Supp. 2d at 649 ("The publication of a letter in the Wall Street Journal urging shareholders to behave in a certain way . . . is similar to the publication of misleading information [and establishes proper venue].").[7] Accordingly, I find that Tang could have originally filed his Complaint in SDNY, WDNY, or New Jersey.

B. *Private Interest Factors*

Having so found, I now determine whether SDNY or WDNY is a more convenient forum than New Jersey. There is no "definite formula" for this inquiry, but courts in the Third Circuit consider the following private interest factors:

> (1) plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records

---

7       The venue analysis under 15 U.S.C. § 78aa differs significantly from the convenience/fairness analysis under 28 U.S.C. § 1404(a). *See infra*.

(similarly limited to the extent that the files could not be produced in the alternative forum).

*Jumara*, 55 F.3d at 879-80; *Huang*, 2016 WL 1090436, at *2 (quotations and citation omitted). I analyze each in turn.

      i.    <u>Factors One and Two</u>

There is ordinarily a strong presumption in favor of a plaintiff's chosen forum, in this case New Jersey, where Tang filed his Complaint. *See, e.g.*, *Windt v. Qwest Comm. Intern., Inc.*, 529 F.3d 183, 190 (3d Cir. 2008). Still, forum choice is a preference not a right. *See Liggett Grp., Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 526 (D.N.J. 2000); *Ricoh Co., Ltd. v. Honeywell, Inc.*, 817 F. Supp. 473 (D.N.J. 1993); *AT&T v. MCI*, 736 F. Supp. 1294, 1306 (D.N.J. 1990). Where a plaintiff chooses to file in a non-home forum, for instance, his choice is afforded less weight. *See Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 295-96 (3d Cir. 2010). Same result obtains when the central facts of a lawsuit occur outside the chosen forum. *See NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F. Supp. 2d 317, 321 (D.N.J. 1998); *In re Consolidated Parlodel Litigation*, 22 F. Supp. 2d 320, 323-24 (D.N.J. 1998). That appears to be the case here: based on the Complaint, Tang does not reside in New Jersey, and no facts arise in this state. *Accord Kelly-Brown v. Winfrey*, No. 11-4360, 2011 WL 5325596, at *3 (D.N.J. Nov. 3, 2011) (giving plaintiffs' choice of forum less deference because they did not reside in New Jersey and had "no connection to [the state] other than their selection of a New Jersey attorney to represent them in this matter").

Moreover, a plaintiff's choice of forum "becomes substantially less important [where] he sues representatively on behalf of a class." *See Job Haines Home for the Aged v. Young*, 936 F. Supp. 223, 228 (D.N.J. 1996) (collecting cases) (quotations omitted). "[I]n such actions the participation of the class representative is generally minimal" and "the potential members of the

class will likely be scattered across the United States." *Santomenno v. Transamerica Life Ins. Co.*, No. 11-736, 2012 WL 1113615, at *5 (D.N.J. Mar. 30, 2012) (quotations and citations omitted). Tang's Complaint is also a putative class action on behalf of anyone who acquired Kodak common stock between July 27, 2020, and August 7, 2020. Tang's decision to file in New Jersey is not decisive for this reason.

Finally, although Defendants have not indicated a forum preference, they filed a non-opposition notice to Kiz Group's transfer motion. *See* ECF No. 54. Kodak's only connection to New Jersey is that it is incorporated here, which "cannot be a dispositive fact in the venue transfer analysis." *See Express Mobile, Inc. v. Web.com Grp., Inc.*, No. 19-1936, 2020 WL 3971776, at *5 (D. Del. July 14, 2020); *Minstar, Inc. v. Laborde*, 626 F. Supp. 142, 146 (D. Del. 1985) ("[T]he mere fact that Delaware is the plaintifffs' choice of forum and . . . the defendants' state of incorporation will not, standing alone, prevent this Court from transferring this suit to another forum."); *Kirschner Bros. Oil, Inc. v. Pannill*, 697 F. Supp. 804, 807 (D. Del. 1988) (stating that minimal asserted connections, such as "the incorporation of some of the Defendants in Delaware[,] is of little consequence"); *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011) ("Neither § 1404 nor *Jumara* list a party's state of incorporation as a factor for a venue inquiry."). Factor two therefore is neutral.

ii.   Factor Three

Kiz Group's transfer motion turns on factor three—where the claims arose. In general, courts analyze this factor by looking to "locus of the alleged culpable conduct." *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988); *Leroy v. Great W. United Corp.*, 443 U.S. 173, 185-86 (1979); *Cottman*, 36 F.3d at 294 ("The test for determining venue is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise

to the claim.'"); *Stillwagon v. Innsbrook Golf & Marina, LLC*, No. 11-1338, 2013 WL 1180312, at *26 (W.D. Pa. Mar. 20, 2013) (observing that factor three "focuses on where the activities relevant to the claims . . . took place"); *Days Inn Worldwide, Inc. v. Inv. Prop. of Brooklyn Ctr., LLC*, No.08-390, 2009 WL 3153277, at *4 (D.N.J. Sept. 25, 2009) (analyzing where "the operative facts occurred"); *NCR Credit Corp.*, 17 F. Supp. 2d at 321 ("As a general rule, the preferred forum is that which is the center of gravity of the accused activity."); *Park Inn Int'l, L.L.C. v. Mody Enterprises*, 105 F. Supp. 2d 370, 377-78 (D.N.J. 2000) (defining center of gravity as the place of "[the underlying] dispute, its events, and transactions").

More specifically, "in the context of claims based on misrepresentations or omissions," as in this securities action, "the misrepresentations and omissions are deemed to occur in the district where they were transmitted or withheld, not where they are received." *See Kerik v. Tacopina*, No. 14-488, 2014 WL 1340038, at *5 (D.N.J. Apr. 3, 2014); *Metro. Life Ins. Co. v. Bank One, N.A.*, No. 03-1882, 2012 WL 4464026, at *6 (D.N.J. Sept. 25, 2012); *Branthover v. Goldenson*, No. 10-7677, 2011 WL 6179552, at *3 (S.D.N.Y. Dec. 12, 2011); *Frato v. Swing Staging, Inc.*, No. 10-5198, 2011 WL 3625064, at *4 (D.N.J. Aug. 17, 2011); *Palagano v. NVIDIA Corp.*, No. 15-1248, 2015 WL 5025469, at *5 (E.D. Pa. Aug. 25, 2015). And "[w]here plaintiff's cause of action arises from strategic policy decisions of a defendant corporation," like here," the defendant's headquarters can be considered the place where events giving rise to the claim occurred." *Panitch v. Quaker Oats Co.*, No. 16-4586, 2017 WL 1333285, at *6 (E.D. Pa. Apr. 5, 2017) (quoting *Ayling v. Travelers Prop. Cas. Corp.*, No. 99-3243, 1999 WL 994403, at *5 (E.D. Pa. Oct. 28, 1999)).[8]

---

[8]    15 U.S.C. § 78aa provides that a securities action is proper—and thus *could be* filed—in any district in which a single act occurs, which courts construe broadly. In fact, the "venue-sustaining act need not constitute the core of the alleged violation, nor even be illegal, so long as it represents more than an immaterial part of the alleged violations." *See S-G Securities*, 466 F. Supp. at 1121 (citations omitted); *In re AES Corp.*, 240 F. Supp. 3d at 559 (collecting cases); *Hilgeman v. National Ins. Co.*, 547 F.2d 298, 301 (5th Cir. 1977) ("The 'act' contemplated by the statute need not be crucial.") (citations omitted); *First*

In opposing each other's transfer arguments, the parties make a far stronger case for venue in WDNY than in either of their preferred forums. First, Kodak is headquartered in Rochester, and keeps no offices or employees in SDNY or New Jersey. *See* Pl. Br. I, at 11. The main facility it sought to revamp with the DFC loan is also there. *Id.* Second, there is no dispute that company executives in Rochester undertook the very actions giving rise to Tang's claims: most importantly, the decision to give stock options to Continenza and Bullwinkle before publicly announcing the DFC loan, and every judgment about what to tell the public thereafter, including what to omit or withhold from public view, which furthered the alleged insider trading. In other words, Defendants hatched and sustained the very fraudulent scheme described in the Complaint in WDNY. There is likewise no basis to find that Defendants did not prepare and file their Form 4s in Rochester, which divulged the option grant (and religious gift) to the SEC after-the-fact, negotiate the DFC loan over the course of several months, sign the LOI, participate in drafting/distributing press statements, and decide what disclosures to make.

Also dispositive: Kiz Group admits that "all statements made other than [the statement on Squawk Box] occurred in Rochester." *See* Pl. Br. I, at 11. This presumably includes Kodak's inadvertent alert to local media on July 27, 2020, and subsequent request to reporters to take it

---

*Federal Savings & Loan Assoc. of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 634 F. Supp. 1341, 1350 (S.D.N.Y. 1986) ("[A]ny non-trivial act in the forum district which helps to accomplish a securities law violation is sufficient to establish venue [for purposes of 78aa]."). The case law, in turn, uniformly supports the proposition that the mere transmission of misleading materials into a district establishes venue under § 78aa, regardless of where the statements themselves were made. *See supra.* By contrast, under § 1404(a), courts must select "the most *appropriate* venue," which "is where a *majority* of events giving rise to the claim arose" and where the "center of gravity" is. *See Amkor Tech*, 2006 WL 3857488, at *5 (emphasis added); *Hoffer*, 102 F. Supp. 2d at 572 (stating that, in analyzing private interest factors such as where the claims arose, a court must determine that "the proposed alternative forum *is not only adequate, but also more appropriate*") (emphasis added). In a securities action such as this one, the center of gravity and locus of events is where the allegedly fraudulent representations or omissions were *made*, not where they were received. *See supra.* Thus, contrary to Kiz Group's position, the fact that an action could have proceeded in a district originally pursuant to § 78aa, because media there covered a defendant's conduct, does not *ipso facto* establish that the district is most convenient under § 1404(a) or that the claims "arose" there for purposes of factor three.

down; Continenza's statement in the press conference with the DFC on July 28, 2020; Continenza's statement to the Wall Street Journal on July 28, 2020, that Kodak has "a long, long history in chemical and advanced materials—well over 100 years," and could "get up and running quickly"; various corrective statements or partial disclosures reported by news outlets between August 1, 2020, and August 5, 2020; the press release announcing the special committee on August 7, 2020; and Continenza's conference call with investors on August 11, 2020, characterizing the certainty of the loan differently than before.

Kiz Group's arguments to the contrary are unavailing. Kiz Group first claims that Defendants made a "key" false statement—about how investors could "bank on" the FDC loan— in SDNY because CNBC's Squawk Box broadcasts from that district. The problem is that Continenza appeared on Squawk Box remotely, from a location neither party can seem to identify, and hence could not have made representations or withheld information in SDNY. *See* Pl. Br. I, at 10 n.7; Pl. Br. II, at 6. Moreover, in Kiz Group's own words, "all other material connections to the alleged fraud [are] in Rochester," which establishes WDNY as the center of gravity of this dispute. *See* Pl. Br. I, at 2.

According to Kiz Group, it is also relevant that the Wall Street Journal is located in SDNY, because it broke news about the stock grant and religious gift, reported Kodak's various corrective statements/partial disclosures, and quoted from company sources. *See* Pl. Br. I, at 11. While this may matter for the purposes of determine where Tang's action could have been brought under 15 U.S.C. § 78aa, *see supra*, it is not dispositive for the purposes of § 1404(a), where the inquiry is the most *appropriate* forum based (in part) on the *locus* of operative events. In this regard, Kiz Group erroneously conflates where a representation or omission is made with where one is disseminated, and attempts to bootstrap transfer to the location of whatever media company

15

broadcasts, publishes, reports, or covers such information. *Cf. In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392,397 (S.D.N.Y. 2006) ("[M]isrepresentations are deemed to occur in the district where the misrepresentations are issued or the truth is withheld, not where the statements at issue are received."); *City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp.*, No. 10-376, 2010 WL 2035130, at *4 (S.D.N.Y. May 21, 2010) ("[T]he locus of operative events in a securities action is where the alleged misrepresentations were made."); *In re Amkor Tech, Inc. Sec. Litig.*, No. 06-298, 2006 WL 3857488, at *5 (E.D. Pa. Dec. 28, 2006) (transferring securities case involving a company with Pennsylvania offices because "the vast majority of events and public statements alleged in the Complaint occurred or were made in Arizona from the Company's Arizona Headquarters"); *Purcell Graham, Inc. v. National Bank of Detroit*, No. 93-8786, 1994 WL 584550, at *4 (S.D.N.Y. Oct. 24, 1994) (transferring to district where defendant "allegedly made representations or failed to disclose information").

Finally, Kiz Group emphasizes that Kodak is on the New York Stock Exchange ("NYSE"), where Continenza and Bullwinkle improperly traded in company stock. *See* Pl. Rep. Br., at 3. These facts are not dispositive either, or else every securities action would wind up in SDNY. *See, e.g.*, *Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb Inc.*, No. 06-01942, 2006 WL 1524590, at *4 (S.D.N.Y. June 5, 2006) ("[T]he SDNY would have even more business and every plaintiff that sued a NYSE firm could nestle in right here at 500 Pearl Street."). Factor three therefore strongly favors transfer to WDNY, where the actionable and operative facts arose.

iii.   <u>Factors Four, Five, and Six</u>

Courts consider party convenience under factor four, focusing on "relative physical and financial condition." *See Liggett*, 102 F. Supp. 3d at 533; *Jumara*, 55 F.3d at 879. Based on the pleadings, neither Tang nor any potential lead plaintiff resides in New Jersey or SDNY, *see* Pl. Br.

I, at 8-9 & n.6, Defendants do not keep offices or personnel in either district, and no party indicates an inability to afford litigation in one place versus another. Factor four is therefore in equipoise.

Courts consider witness convenience under factor five, but "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879. This is often the most important private interest factor. See *Headon v. Colo. Boys Ranch*, No. 204-04847, 2005 WL 1126962, at \*7 (E.D. Pa. May 5, 2005); *Blankenship v. Graco Children's Prod., Inc.*, No. 11-04153, 2011 WL 4712419, at \*3 (E.D. Pa. Oct. 6, 2011). No present party alleges that any witness could not attend trial in any forum. To the contrary, because "the lion's share of potential witnesses presumably reside in Rochester," where "Defendants are located," *see* Pl. Br. I, at 11-12, WDNY plainly seems most convenient. *See, e.g.*, *In re Global Cash Access Holdings, Inc. Sec. Litig.*, No. 08-3516, 2008 WL 4344531, at \*4 (S.D.N.Y. Sept. 18, 2008) ("[I]n cases where, as here, the plaintiff alleges that certain documents contained false or misleading statements, the key witnesses are frequently 'officers and employees of [the issuer] who participated in drafting or distributing [those] statements.'") (quoting *In re Stillwater Mining Co. Sec. Litig.*, No. 02-2806, 2003 WL 21087953, at \*4 (S.D.N.Y. May 12, 2003)). Factor five therefore favors transfer to WDNY.

Finally, under factor six, courts consider "the location of books and records," but again "only to the extent that the files could not be produced in the alternative forum." *Jumara*, 55 F.3d at 879. While the relevant documents in this matter are almost certainly located at Kodak headquarters in Rochester, "technological advances of recent years have significantly reduced the weight of [this factor] in the balance of convenience analysis." *See Lomanno v. Black*, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003); *Copley v. Wyeth, Inc.*, No. 09-722, 2009 WL 2160640, at \*6 (E.D. Pa. July 16, 2009)); *Huang*, 2016 WL 1090436, at \*3. Both parties recognize this, so I do not

attach weight to this factor. Accordingly, in sum, the private interest factors favor transfer to WDNY.

### C. Public Interest Factors

Courts in the Third Circuit also consider various public interest factors on a § 1404(a) transfer motion:

> (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara*, 55 F.3d at 879-80.

Kiz Group stresses court congestion. *See* Pl. Br. I, at 13. As a rule, that factor is not "of great importance" on a transfer motion. *See Kisko v. Penn. Cent. Transp., Co.*, 408 F. Supp. 984, 987 (M.D. Pa. 1976); *Gallagher v. Ocular Therapeutix, Inc.*, No. 17-05011, 2017 WL 4882487, at *5 (D.N.J. Oct. 27, 2017) ("[D]ocket congestion is not a particularly important factor compared with the local interests of each forum."); *Burstein v. Applied Extrusion Technologies, Inc.*, 829 F. Supp. 106, 114 (D. Del. 1992) (finding congestion "insufficient to prevent a § 1404(a) transfer which is otherwise mandated by the convenience of the parties and witnesses"). This is especially so when "the reality is that [both venues] are [] busy." *See Eastman v. First Data Corp.*, No. 10-5860, 2011 WL 1327707, at *5 (D.N.J. April 5, 2011). New Jersey faces the most significant backlog of cases in the country. As of December 31, 2020, we had the most civil filings, the second most pending cases, and the third most pending cases at least three years old.[9] WDNY has a comparatively lower caseload, which favors transfer there.

---

[9]     *See* Federal Court Management Statistics—National Judicial Caseload Profile (Dec. 31, 2020), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2020.pdf.

Although Kiz Group does not discuss the other public interest factors, they all are either neutral or in favor of transfer. Factor one is neutral because Tang's claims arise under federal securities law and there is no distinction between a judgment in WDNY, SDNY, or New Jersey. *See, e.g.*, *In re USA Tech.*, 2019 WL 4785780, at \*4; *Zazzali v. Swenson*, 852 F. Supp. 2d 438, 451 (D. Del. 2012) (concluding same). Factor six is also neutral because federal courts are presumed to be equally "familiar with the applicable" federal law, here a longstanding securities statute. *See, e.g.*, *Schlenker v. Immucor, Inc.*, No. 09-04297, 2009 WL 5033972, at \*5 (E.D. Pa. Dec. 22, 2009) ("Both courts are intimately familiar with federal securities laws."); *Liggett Grp.*, 102 F. Supp. 2d at 537 (same, but antitrust); *Honeywell*, 817 F. Supp. at 486 (same, but patent).

Factor two favors transfer to WDNY for the same reason as the private interest factors: it would make trial substantially easier on Defendants and witnesses, and no harder on anyone else. *Compare Fink on behalf of Nation Safe Drivers Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 473 F. Supp. 3d 366, 376 (D. Del. 2020) ("Plaintiff and all the Individual Defendants reside in the Southern District of Florida. The parties have represented that there are witnesses and documentary evidence in the Southern District of Florida. Thus, this factor weighs in favor of transfer."), *with Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, No. 20-200, 2020 WL 1888950, at \*7 (E.D. Pa. Apr. 16, 2020) ("The practical considerations discussed above weigh against transfer given the presence of potentially key witnesses here in Pennsylvania."). Likewise, under factor four, WDNY has a strong interest in deciding a local controversy involving one of its biggest corporate citizens, and bearing virtually no relationship to any other place, at home. *See, e.g.*, *Metro. Life Ins.*, 2012 WL 4464026, at \*8 (finding that New York has a "compelling interest in adjudicating the controversy and regulating the conduct of its corporations and the activities of corporate officers working for corporations which conduct business in that state"); *HAB Carriers,*

*Inc. v. Arrow Truck Sales, Inc.*, No. 0704390, 2009 WL 2589108, at \*4 (D.N.J. Aug. 21, 2009) (same); *Tradimpex Egypt Co. v. Biomune Co.*, 777 F. Supp. 2d 802, 810 (D. Del. 2011) ("Delaware, too, has a local interest, in that one of its citizens—Biomune, a Delaware corporation—is alleged to have breached a contract.").

Finally, factor five favors transfer because New Jersey has a public policy to preserve its limited judicial resources, or at least not waste them on litigation with no meaningful connection to the state. *See, e.g.*, *In re Exxon Mobil Corp. Derivative Litig.*, No. 19-16380, 2020 WL 5525537, at \*4 (D.N.J. Sept. 15, 2020) ("New Jersey jurors should not be burdened with adjudicating a matter concerning decisions and/or conduct which occurred [] exclusively outside the State of New Jersey."); *Govan v. United States*, No. 09-00491, 2009 WL 10664440, at \*4 (D.N.J. Dec. 22, 2009) ("New Jersey jurors should not be burdened with adjudicating a matter concerning conduct which occurred in Georgia."); *Honeywell*, 817 F. Supp. at 486 ("[T]he burden of jury duty ought not to be imposed upon the people of a community which have no relation to the litigation."). Accordingly, in sum, the public interest factors favor transfer to WDNY.

## IV.   CONCLUSION

For the foregoing reasons, I **TRANSFER** this matter to the Western District of New York, and decline to decide the three lead plaintiff motions, which the transferee court may consider in the normal course.

**DATED**: May 27, 2021                                    /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         U.S. Chief District Judge