UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

In re EASTMAN KODAK COMPANY
SECURITIES LITIGATION.

**DECISION AND ORDER**

6:21-CV-6418 EAW

_____

### INTRODUCTION

This action arises out of the events surrounding a Letter of Interest ("LOI") entered into between defendant Eastman Kodak Company ("Kodak") and the United States International Development Finance Corporation ("DFC") in July of 2020, discussing a contemplated loan of $765 million from DFC to Kodak to support the conversion of Kodak's manufacturing facilities to produce pharmaceutical products. It consists of two matters transferred to this District and consolidated for all purposes into a single action denominated "In re Eastman Kodak Company Securities Litigation." (Dkt. 89).

In the consolidated class action complaint, Lead Plaintiffs Les Investissements Kiz Inc. ("Kiz, Inc.") and UAT Trading Service, Inc. ("UAT") (collectively "Plaintiffs") allege violations of federal securities laws by defendants Kodak, Kodak's Executive Chairman and CEO James V. Continenza ("Continenza"), CFO David Bullwinkle ("Bullwinkle"), General Counsel Roger W. Byrd ("Byrd"), director Philippe D. Katz ("Katz"), director Richard "Todd" Bradley ("Bradley"), director Jason New ("New"), director Jeffrey Engelberg ("Engelberg"), director William G. Parrett ("Parrett"), and director George Karfunkel ("Karfunkel") (collectively "Defendants"). (Dkt. 116).

Presently before the Court is a joint motion filed by Defendants seeking dismissal of the consolidated class action complaint for failure to state a claim upon which relief may be granted.  (Dkt. 159).  For the reasons that follow, Defendants' motion is granted in its entirety.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the consolidated class action complaint.  (Dkt. 116).  As is required at this stage of the proceedings, the Court treats Plaintiffs' factual allegations as true.

Plaintiffs commenced this putative federal securities class action against Kodak, an internationally recognized company known primarily for its photography and film manufacturing business, on behalf of certain purchasers of Kodak securities.  (*Id.* at ¶ 43).  Following bankruptcy proceedings in 2012, Kodak began expanding its business by focusing on commercial products and digital printing.  (*Id.*).

In the spring of 2020, during the emergence of the COVID-19 pandemic, the United States government began exploring the possibility of obtaining assistance from domestic companies qualified to provide products and services to help fight COVID-19.  (*Id.* at ¶ 45).  Specifically, on May 14, 2020, then-President Donald Trump issued an executive order which permitted the DFC to issue loans to domestic companies capable of providing strategic resources responsive to the COVID-19 outbreak.  (*Id.* at 46).

In response to the White House announcement, Kodak dedicated resources to explore its ability to produce chemical ingredients used in the manufacture of drugs

designed to combat COVID-19, including hydroxychloroquine.  (*Id.* at ¶ 47).  The prospect of a lucrative government loan caused Kodak's stock price to rise from the $2 range, where it sat in the spring of 2020.  (*Id.*).

Kodak designated the new project with the code name "Project Tiger" to maintain its confidentiality.  (*Id.* at ¶ 49).  Individuals on the Project Tiger clearance list included Continenza, Byrd, and three dozen Kodak employees.  (*Id.*).  On June 18, 2020, Kodak emailed all Project Tiger team members informing them of their status on the clearance list and warning them that knowledge of the project could be considered material non-public information ("MNPI").  (*Id.* at ¶¶ 52, 53).  The internal memo warned members against trading in Kodak stock while in possession of MNPI and directed them to pre-clear any trade transaction with Byrd.  (*Id.* at ¶ 53).

On June 23, 2020, Continenza purchased 46,737 shares of Kodak stock at an average price of $2.22 a share and Katz purchased 5,000 shares at the same average price. (*Id.* at ¶ 54).  The purchases by Continenza and Katz occurred on the last day of an open window trading period which permitted Kodak insiders to transact in Kodak stock so long as they were not in possession of MNPI or in violation of Kodak's insider trading policy. (*Id.* at ¶ 54).  Three days later on June 26, 2020, Kodak submitted its loan package to the DFC.  (*Id.* at ¶ 55).

On July 8, 2020, Kodak was informed that DFC representatives wanted to conduct a site visit at Kodak headquarters.  (*Id.* at ¶ 56).  On July 22, 2020, DFC officials toured the Kodak facility and met with Kodak executives, including Continenza and Bullwinkle. (*Id.* at ¶ 57).  During the visit, Kodak learned that DFC would enter into an LOI with Kodak

regarding the potential loan and that the LOI would be announced in a press release on July 28, 2020. (*Id.*). Before the announcement, DFC sent Kodak a draft term sheet identifying the terms of the $765 million loan but making clear it was for discussion purposes only. (*Id.* at ¶ 58). Correspondence between Kodak and DFC explicitly noted that the LOI was subject to a comprehensive review and approval process requiring due diligence. (*Id.* at ¶ 59). The LOI also expressly stated that DFC would not enter into any commitments until the process was completed satisfactorily and that the letter was not and could not be deemed an agreement or commitment by DFC to provide support for the project. (*Id.* at ¶ 60).

The day before the LOI was scheduled to be announced, Continenza and Byrd convened a meeting of Kodak's Board of Directors and its Compensation, Nominating and Governance Committee[1] ("CNG Committee") to notify them of the LOI prior to the DFC announcement and to seek approval for granting "spring-loaded" stock options to certain members of Kodak's senior management, including Continenza, Bullwinkle, and Byrd. (*Id.* at ¶ 62). The options granted these Defendants the right to purchase Kodak shares at a pre-arranged strike price that would be worth millions if the stock price surged. (*Id.* at ¶ 63).

On the same day, July 27, 2020, Kodak leaked information to the press concerning the July 28th announcement. (*Id.* at ¶ 67). Just after noon on that day, local news reporters in Rochester, New York, began tweeting information about a Kodak initiative to manufacture products to help create medicines used to fight COVID-19. (*Id.* at ¶ 68). One

---

[1]     The CNG Committee was composed of Bradley, Katz, and New.

local television news reporter tweeted, "Kodak tells @13WHAM we should expect an announcement soon with senior U.S. govt officials regarding a new manufacturing initiative that 'could change the course of history for Rochester and the American people.' No more details released but wow, that's quite a promise." (*Id.* (citation omitted)).

Following the leak, the price of Kodak's shares increased and closed at $2.62 a share, but opened the following morning at $9.63 a share, representing a nearly 370% overnight increase. (*Id.* at ¶ 70). On July 28, 2020, at 6:00 a.m. and before the market opened, the *Wall Street Journal* published an article which stated that Kodak was awarded a $765 million government loan to expedite domestic production of drugs needed to combat the COVID-19 pandemic. (*Id.* at ¶ 71). Continenza was quoted in the article as indicating that Kodak would produce key starter materials and active pharmaceutical ingredients and "expects the loan to create around 300 jobs in Rochester, and 30 to 50 in Minnesota." (*Id.*).

At approximately 9:00 a.m. on July 28, 2020, just before the market opened, the DFC issued a statement confirming the contemplated deal for the $765 million loan to Kodak. (*Id.* at ¶ 73). The statement quoted Continenza as stating, "[b]y leveraging our vast infrastructure, deep expertise in chemicals manufacturing, and heritage of innovation and quality, Kodak will play a critical role in the return of a reliable American pharmaceutical supply chain." (*Id.* ). Kodak's shares rose to an intra-day high of $11.80 per share and closed at $7.94 per share. (*Id.* at ¶ 74).

The following day, Continenza appeared on several interviews with financial news media. (*Id.* at ¶ 78). In an interview with CNBC, Continenza was asked if this was a "done deal," and Continenza replied, "[w]ell, we feel very comfortable that we can bank on it,"

and "we feel very comfortable we're gonna get to the end game or we wouldn't be probably sitting here." (*Id.*). Later that morning, he appeared on Fox Business and stated, "we will supply about 25% of the small molecule KSMs and APIs—which is key starter materials, or active pharmaceutical ingredients, you know, for the US supply chain, with other partners." (*Id.* at ¶ 79). Finally, he appeared on Yahoo News and was asked about Kodak's plans, responding in part that: "we will create 300 jobs, about 1200 indirect jobs in upstate New York area. It will take about 3 ½ years roughly to build it, but there will be phases right. It will come out and we will produce more, and it will come out and we will produce more. It will come out and it will go to continuous. And that's what will happen. So it will be phased in for the next 3 ½ years but for sure in the first year and a half will just be very small batches." (*Id.* at ¶ 80). On July 29, 2020, Kodak's shares rose to an intra-day high of $60 per share and closed at $33.20 per share, or more than 318% higher than the closing price the previous day. (*Id.* at ¶ 81).

Also on July 29, 2020, Defendants disclosed in Form 4 SEC filings that Continenza, Bullwinkle, and other executives had been granted options on July 27th. (*Id.* at ¶ 84). After the market closed that day, the *Wall Street Journal* published an article entitled, "Tweets and Articles Sent Kodak Shares Surging Before Official Announcement." (*Id.* at ¶ 85). On July 30, 2020, Kodak's shares fell by $3.37 a share to close at $29.83 per share. (*Id.* at ¶ 86).

In a communication between Kodak and DFC on July 30, 2020, that discussed questions from the media about the loan, DFC's Chief Communications Office stated, "[t]his could be a good opportunity to remind [the inquiring reporter] that the loan is not

finalized/approved.   We signed a letter of interest and the loan is still going through the DFC's approval process."   (*Id.* at ¶ 87 (alterations in original)).   A July 31, 2020 *New York Times* article was entitled, "Kodak C.E.O. Got Stock Options Day Before News of Loan Sent Stock Soaring."   (*Id.* at ¶ 88).   The same day, the *Wall Street Journal* published a story entitled, "Kodak's Stock Surge Turned Insiders' Options into Potential Windfall."   (*Id.* at ¶ 89).   A Kodak spokesperson responded that the loan was not guaranteed and no deal had been finalized.   (*Id.*).   Kodak shares declined an additional $7.98 per share to close at $21.85 per share.   (*Id.* at ¶ 90).

Over the next several days, additional news sources reported on the options.   (*Id.* at ¶ 91).   Kodak's shares continued to fall and closed at $14.91 per share on August 3, 2020. (*Id.* at ¶ 92).   On August 4, 2020, media outlets reported that United States Senator Elizabeth Warren had asked U.S. regulators to examine possible insider trading occurring prior to the July 28, 2020 announcement of the DFC loan.   (*Id.* at ¶ 93).   It was also reported on the morning of August 4, 2020, that Kodak's disclosure of the loan and stock surge were being examined by the SEC.   (*Id.*).

On August 5, 2020, the *Wall Street Journal* published an article that indicated that several congressional committees were seeking records from Kodak and the DFC.   (*Id.* at ¶ 94).   On August 7, 2020, Kodak announced that it would conduct an "internal review" of the facts surrounding the disclosure of the loan and the granting of the options.   (*Id.* at ¶ 95).   Kodak appointed a special committee of independent directors, including New and Parrett, to oversee the review, which was conducted by Kodak's outside counsel.   (*Id.*).

Later the same day, the DFC issued a tweet concerning the loan and indicating that "[r]ecent allegations of wrongdoing raise serious concerns," and that it would not "proceed any further unless these allegations are cleared." (*Id.* at ¶ 96). On August 10, 2020, Kodak's shares fell by $4.15 per share to close at $10.73 per share. (*Id.* at ¶ 98).

On August 11, 2020, the *Wall Street Journal* published an article that indicated that an SEC filing from the previous week documented that Karfunkel had made a gift of three million shares to a congregation in Brooklyn, New York. (*Id.* at ¶ 99). It was later reported that Karfunkel served as one of three officers of the charitable foundation that was the recipient of the donation and Karfunkel never obtained pre-approval, as required by Kodak company policy, to make a gift of Kodak shares. (*Id.* at ¶ 100). Kodak's share price closed on August 11 at $10.01, down 6.7% from the previous day. (*Id.*). After the market closed that day, Kodak held a conference call during which Continenza referred to the loan as a "potential loan" and indicated support for the DFC decision to await clarification before moving forward. (*Id.* at ¶ 101). Kodak's May 17, 2021 filing with the SEC indicates that the LOI has never been formally terminated, but given the time elapsed, Kodak is operating on the basis that the loan will not proceed. (*Id.* at ¶ 101 n. 16).

The consolidated class action complaint alleges three causes of action: first, against Kodak and Continenza for violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder (*id.* at ¶¶ 189-193); second, against all defendants for violations of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder (*id.* at ¶¶ 194-202); and third, against the individual defendants for violation of § 20(a) of the Exchange Act (*id.* at ¶¶ 203-211). The consolidated class

action complaint alleges a class period of July 27, 2020, through August 11, 2020, and the claims are asserted on behalf of all persons or entities that purchased or sold publicly traded securities of Kodak during that period.  (*Id.* at ¶ 184).

## II.    Procedural Background

*Tang v. Eastman Kodak Co.*, Civil Action No. 6:21-cv-6418, was filed in the United States District Court for the District of New Jersey on August 13, 2020.  (Dkt. 1).  On August 26, 2020, *McAdams v. Eastman Kodak Co.*, Civil Action No. 6:21-cv-6449, was filed in the United States District Court for the Southern District of New York.  Both matters were transferred to this District on May 28, 2021, and June 15, 2021, respectively.  (Dkt. 63).  By Stipulation and Order entered June 22, 2021, the matters were consolidated for all purposes into one action and *McAdams* was administratively terminated.  (Dkt. 89).

On August 2, 2021, the Court granted a motion by Kiz Inc. and UAT to be appointed as lead plaintiffs and denied several other parties' motions for the same relief.  (Dkt. 92).  The Court directed that deadlines for subsequent pleadings and motions would be governed by the Stipulation and Order entered on September 14, 2020.  (Dkt. 7).  On October 1, 2021, Plaintiffs filed their consolidated class action complaint.  (Dkt. 116).  The parties thereafter agreed to and the Court approved an extension of time for Defendants to respond to the consolidated class action complaint.  (Dkt. 125).

On December 14, 2021, Defendants filed the instant joint motion to dismiss the consolidated class action complaint for failure to state a claim.  (Dkt. 159).  A joint memorandum of law was filed on behalf of all defendants (Dkt. 159-1) and separate supplemental memoranda on behalf of certain outside directors were also filed (Dkt. 160;

Dkt. 161).  On February 28, 2022, Plaintiffs filed their opposition (Dkt. 173), and on April

6, 2022, Defendants filed their replies (Dkt. 177; Dkt. 178; Dkt. 179).  The Court heard

oral argument on August 3, 2022, and reserved decision.  (Dkt. 196).

**DISCUSSION**

## I.     Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents

attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *Hawaii

Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d

821, 831 (S.D.N.Y. 2019) (noting that on a motion to dismiss, the court can consider "(1)

documents attached to or incorporated by reference in the complaint, (2) documents

integral to and relied upon in the complaint, even if not attached or incorporated by

reference, (3) public disclosure documents required by law to be, and that have been, filed

with the SEC, and (4) facts of which judicial notice properly may be taken.").  A court

should consider the motion by "accepting all factual allegations as true and drawing all

reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund

v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  Generally, to withstand dismissal, a

claimant must set forth "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II. Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) Heightened Pleading Standard

The PSLRA, codified in part at 15 U.S.C. § 78u-4(b), was passed "to provide uniform standards for class actions and other suits alleging fraud in the securities market." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107 (2d Cir. 2001). Securities fraud allegations are also subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *In re Ideanomics, Inc.*, *Sec. Litig.*, No. 20 CIV. 4944 (GBD), 2022 WL 784812, at *6 (S.D.N.Y. Mar. 15, 2022) ("Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act[.]"). To satisfy the pleading requirements of Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the securities

context, "[a] plaintiff relying on false or misleading public statements must identify the statements in question, identify the speaker, state when they were issued, and explain why the statements were fraudulent." *Sec. & Exch. Comm'n v. MiMedx Grp., Inc.*, No. 19 CIV. 10927 (NRB), 2022 WL 902784, at \*5 (S.D.N.Y. Mar. 28, 2022) (citing *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).   "Additionally, the PSLRA expands upon Rule 9(b) by requiring the plaintiff to '(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"   *In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812, at \*6 (quoting 15 U.S.C. § 78u-4(b)(2)).

## III.   Defendants' Motion to Dismiss

### A.   Count 1—Section 10(b) and Rule 10b-5(b) Claim

Plaintiffs' first claim is asserted against Kodak and Continenza pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b).

> Under Rule 10b-5(b), it is "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of securities.   To support a claim for material misrepresentation under that rule, a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation.   The first two elements must be pled with heightened specificity pursuant to [the PSLRA and Rule 9(b)].

*Noto v. 22nd Century Grp., Inc*., 35 F.4th 95, 102-03 (2d Cir. 2022) (alteration in original and quoting 17 C.F.R. § 240.10b-5); *see In re Garrett Motion Inc. Sec. Litig.*, No. 20 CIV.

7992 (JPC), 2022 WL 976269, at *11 (S.D.N.Y. Mar. 31, 2022) ("To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  Because this type of claim alleges securities fraud, it must meet the heightened pleading standards under Rule 9(b) and the PSLRA." (quotation and citation omitted)); *Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, No. 21-CV-0036 (LJL), 2022 WL 837114, at *6 (S.D.N.Y. Mar. 21, 2022) ("To succeed on their Section 10(b) and Rule 10b-5 claim, Plaintiffs must plead—and ultimately prove—(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." (quotation and citation omitted)).

Defendants argue that Plaintiffs have failed to adequately allege that Defendants made misstatements or omissions of material fact in connection with the DFC loan.  The Court agrees, for the reasons that follow.

"Rule 10b-5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state."  *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 119 (D. Conn. 2021) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020) ("A violation of securities laws premised on misstatements cannot occur unless an alleged material misstatement was false at the

time it was made."); *Hart v. Tri-State Consumer, Inc.*, No. 21-CV-1738 (VEC), 2021 WL 5180923, at *9 (S.D.N.Y. Nov. 6, 2021) ("To plausibly allege a misstatement or omission of material fact, the plaintiff must plead that a statement of fact by defendants was false or misleading at the time the statement was made.").

In order to be considered material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Bos. Ret. Sys.*, 556 F. Supp. 3d at 119 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" (alteration in original and quoting *Basic Inc.*, 485 U.S. at 231-32)).

In contrast to a statement of existing fact, an expression of an opinion, expectation, or intention may not be actionable under Rule 10b-5 unless certain conditions are met. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 315 (S.D.N.Y. 2020). Specifically, "[a]n opinion statement is not actionable unless the speaker disbelieved the statement at the time it was made, the opinion contained 'one or more embedded factual statements that can be proven false,' or the opinion 'implied facts that can be proven false.'" *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 202 (S.D.N.Y. 2020) (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173, 175 (2d Cir. 2020)); *see also In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-CV-04494-GHW, 2021 WL 4482102, at *10 (S.D.N.Y. Sept. 30, 2021) ("[O]pinions, although sincerely held and otherwise true

as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." (citation omitted)); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 524-25 (S.D.N.Y. 2020) ("The Second Circuit has observed that opinion statements can be actionable if they contain one or more embedded factual statements that can be proven false," or "impl[y] facts or the absence of contrary facts that are capable of verification." (original alteration, quotations and citations omitted)). "Statements of opinion must be examined in the context in which they arise." *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *9.

Similarly, mere statements of puffery are not actionable. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). "Puffery encompasses 'statements [that] are too general to cause a reasonable investor to rely upon them' . . . and thus 'cannot have misled a reasonable investor.'" *Oak Hill Mgmt., Inc. v. Edmund & Wheeler, Inc.*, No. 2:20-CV-124, 2021 WL 3855669, at *11 (D. Vt. Aug. 27, 2021) (alterations in original and quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245). "[M]ere[] generalizations regarding [Defendants'] business practices . . . are 'precisely the type of "puffery" that [the Second Circuit] and other circuits have consistently held to be inactionable.'" *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) (alterations in original and quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 206).

Separately, the PSLRA provides a safe harbor for forward-looking statements. "Under the PSLRA's safe harbor, a defendant 'shall not be liable with respect to any

forward-looking statement' if (1) the forward-looking statement is 'identified' as such and 'accompanied by meaningful cautionary statements,' or (2) the forward-looking statement is 'immaterial,' or (3) the plaintiff 'fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading.'" *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d at 253 (alteration in original and quoting 15 U.S.C. § 78u-5(c)(1)(A)–(B)). "For a forward-looking statement to be actionable, the plaintiff must show that the statement was made with actual knowledge of its falsity by the speaker." *Id.* (alteration, quotation, and citation omitted). "Generic, indefinite statements of corporate optimism typically are not actionable because reasonable investors do not place substantial reliance on generalizations regarding a company's health or the strength of a company's product." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 523 (quotation and citation omitted).

Applying these legal principles, the Court agrees with Defendants that none of the specific statements allegedly made by Kodak and Continenza are actionable under § 10(b) and Rule 10b-5(b). Plaintiffs have identified three sources of affirmative statements forming the basis of their claim: the July 27, 2020 press release Kodak leaked to the media; the July 28, 2020 *Wall Street Journal* article; and Continenza's July 29, 2020 interviews with CNBC, Fox News, and Yahoo Finance. Turning first to the leaked press release from July 27, 2020, in which an unidentified Kodak spokesperson stated that a new manufacturing initiative would soon be announced that "could change the course of history for Rochester and the American people" (Dkt. 116 at ¶¶ 68-69), this statement is a classic example of non-actionable puffery and/or corporate optimism. *See, e.g., In re Bristol-*

*Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 559 (S.D.N.Y. 2004) (statement that new drug "potentially represent[ed] one of the most important advances in cancer medicine" was not actionable because it was "non-actionable opinion, personal or corporate optimism and puffery"). Moreover, while "puffery may be actionable if the declarant knew the contrary to be true," *In re Peabody Energy Corp. Sec. Litig.*, No. 20-CV-8024 (PKC), 2022 WL 671222, at *13 (S.D.N.Y. Mar. 7, 2022), there are no allegations in the consolidated class action complaint suggesting that the unidentified Kodak spokesperson who made the statement did not genuinely believe that the new manufacturing initiative contemplated by the LOI would have a substantial impact in the fight against COVID-19.

Plaintiffs argue in a footnote that this statement "cannot be considered mere puffery" in context "because, at the time, Kodak was foundering as a company and no longer had a core set of products or services on which it could rely for revenue." (Dkt. 173 at 52 n. 22). As an initial matter, Plaintiffs' relegation of this argument to a footnote relieves the Court of any burden to consider it. *See Stensrud v. Rochester Genesee Reg'l Transportation Auth.*, 507 F. Supp. 3d 444, 459 (W.D.N.Y. 2020) (collecting cases). Moreover, the case on which Plaintiffs rely, *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263 (S.D.N.Y. 2016), is inapposite. There, the corporation's executive chairman stated that a proposed merger was a "singular and unique opportunity" for shareholders to "optimize value" despite expressly knowing that it "was not a unique acquisition opportunity, and was never intended to optimize value." *Id.* at 269. In other words, the declarant knew the statement to be untrue, unlike in this case where there are no such allegations in the consolidated class action complaint.

- 17 -

Considering next the July 28, 2020 *Wall Street Journal* article, the Court considers as a threshold matter whether either Kodak or Continenza can be considered the "maker" of any statements set forth therein. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). While there are many statements and assertions set forth in the *Wall Street Journal* article, pursuant to *Janus*, Continenza and Kodak can be held liable under Rule 10b-5(b) only for those statements that are expressly attributed to Continenza. *See id.* at 142-43 ("[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) ("In the post-*Janus* world, an executive may be held accountable . . . where the statement is attributed to the executive."), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). Plaintiffs essentially concede this point in their papers, arguing that Continenza made the following statements that were "explicitly attributed" to him in the *Wall Street Journal* article: (1) a statement that "Kodak will produce 'starter materials' and 'active pharmaceutical ingredients'" and; (2) a statement that he "expects the loan to create around 300 jobs in Rochester, and 30 to 50 in Minnesota[.]" (Dkt. 173 at 53). The Court accordingly focuses its analysis on those statements.

The statements within the *Wall Street Journal* article attributed to Continenza are forward-looking statements made by a natural person. *See* 15 U.S.C.A. § 78u-5(i)(1) (forward-looking statements include "a statement of the plans and objectives of

management for future operations, including plans or objectives relating to the products or services of the issuer"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (statement that "we are working with a number of multimedia segment products which will hit the market in 2004 and 2005" was forward-looking and non-actionable).  Accordingly, they can form the basis for Plaintiffs' first cause of action only if Continenza had actual knowledge that they were false or misleading.

Plaintiffs argue that this requirement has been satisfied because Continenza "knew of the spring-loaded options and the LOI's unequivocal terms that it was 'subject to DFC's comprehensive review and approval process,' and thus was aware at the time these statements were made that Defendants' actions in connection with the DFC announcement <u>would cause</u> the DFC to pull the loan." (Dkt. 173 at 51 (emphasis added)).  However, the claim that Continenza knew that that the grant of the stock options "would cause DFC to pull the loan" at the time he made the statements at issue is entirely speculative.  Indeed, the consolidated class action complaint is clear that Defendants' alleged scheme was premised on the DFC loan ultimately being consummated.  (*See, e.g.,* Dkt. 116 at ¶¶ 16, 62).

This kind of speculation is insufficient to take these statements out of the PSLRA's safe harbor provisions.  The Second Circuit has explained that scienter "is a required element . . . in the actual knowledge prong of the statutory safe harbor" and accordingly "a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quotation omitted).  Under that standard, "a 'complaint will survive

. . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (alteration in original and quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).  Here, the facts alleged are overwhelmingly more consistent with the conclusion that Defendants intended for the DFC loan to be consummated, inasmuch as it was the associated long-term rise in Kodak stock prices that would make their "spring-loaded" stock options so valuable.

Indeed, the consolidated class action complaint states that Defendants recognized the "massive opportunity" presented and that they "devoted a huge amount of monetary and executive resources in their effort to convince the government to loan Kodak hundreds of millions of dollars to convert its current manufacturing facilities into those that could manufacture [key starter materials] and [active pharmaceutical ingredients]."  (Dkt. 116 at ¶ 48).  In the absence of any factual allegations plausibly suggesting that Continenza had actual knowledge that the DFC would not ultimately make a loan to Kodak at the time the statements attributed to him in the *Wall Street Journal* article (or any other forward-looking statements regarding Kodak's anticipated plans once the anticipated loan issued) were made, Plaintiffs "allege nothing more than fraud by hindsight," *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 236 (S.D.N.Y. 2021), and "pleadings based on fraud by hindsight are not actionable as a matter of law," *Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010).

The Court turns next to the statements made by Continenza in his July 29, 2020, interviews with CNBC, Fox News, and Yahoo Finance.  These statements consist of:

stating "[W]e feel very comfortable that we can bank on it," "[W]e feel very comfortable we're going to get to the end game" and "We feel very comfortable we're gonna get to the end game or we wouldn't be probably sitting here," in response to the questions "Is this a done deal?" and "Do you expect . . . that we can bank on this . . .?"; stating "[W]e will supply about 25% of the small molecule KSMs and APIs—which is key starter materials, or active pharmaceutical ingredients, you know, for the US supply chain, with other partners" in response to the question, "Are you gonna take over the supply of basic drug ingredients and take it over from China? Is that the goal?"; stating "[W]e're going to have several supply agreements you'll see with other US manufacturers and you know jointly we know we can be competitive," "We're going to move from batch manufacturing to continuous manufacturing to keep . . . costs down," "If you look at the jobs we are creating, it looks like 300," and "We're moving technology and that's how we are going to compete," in response to the question, "I am interested in looking at just what the rollout looks like. . . . Who's setting the bar for what competitive will look like?"; and stating, "We are moving as quickly as we can," "The build out will take approximately 3, 3 ½ years to do," and "[W]e will create 300 jobs, about 1200 indirect jobs in [the] upstate New York area.  It will take about 3 ½ years roughly to build it, but there will be phases right.  It will come out and we will produce more, and it will come out and we will produce more.  It will come out and it will go to continuous. And that's what will happen. So, it will be phased in for the next 3 ½ years but for sure in the first year and a half will just be very small batches," in response to the question, "[D]o you have like a month or date in mind

when you know the US supply of drugs will start using the chemicals—the APIs from Kodak. . .?"  (Dkt. 116 at ¶¶ 109- 111).

As to Continenza's statements during his interview with CNBC that "we feel very comfortable that we can bank on it" and "we feel very comfortable we're going to get to the end game," the Court agrees with Defendants that these are statements of belief, opinion, and/or corporate puffery that cannot form the basis for a Rule 10b-5(b) claim.  The Second Circuit recently found very similar statements—namely, a corporation's statements that it was "pretty confident" and "pretty positive" about "the prospect of renewing partnerships in 2019"— to be "inactionable corporate puffery."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021).

Moreover, Continenza was responding to a question that acknowledged that DFC was conducting due diligence, used vague language such as "we feel," "comfortable," and "probably" in order to convey a lack of certainty, and explained in the very same answer that there was still "some work to do."  (Dkt. 116 at ¶ 109); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) ("A reasonable person . . . recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content."); *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (the fact that there was ongoing dialogue between the FDA and the Defendants in which the FDA had "expressed concern about Defendants' testing methodology . . . did not prevent Defendants from expressing optimism, even exceptional optimism, about the likelihood of drug approval"); *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 483 (S.D.N.Y. 2018) (statement that "we remain comfortable with our

balance sheet and our liquidity position" was a "vague and broad opinion[] on the part of the speaker"). And, as discussed above, there is no reasonable inference from the facts alleged that Continenza did not believe, at the time he made these statements, that Kodak would receive a loan from DFC. Continenza's optimistic opinions about the likelihood of the DFC loan ultimately being issued simply are not actionable under § 10(b) or Rule 10b-5(b), particularly when considered in the context of the clear disclosure to the public by DFC that the LOI was not binding and that DFC's due diligence was ongoing.

The remainder of Continenza's June 29, 2020 statements—made during his interviews with Fox News and Yahoo News—are forward-looking statements made by a natural person and accordingly are not actionable for the reasons discussed above with respect to the statements contained in the *Wall Street Journal* article. Alternatively, these statements are predictions about future performance and are accordingly "actionable under Section 10(b) or Rule 10b-5" only "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citations omitted); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (statements may be both forward-looking and opinions/statements of expectation). None of these conditions are satisfied here.

Taken in context—as they must be under the applicable legal standard—Continenza's statements cannot be considered guarantees. In his interview with Fox News, Continenza was specifically responding to a question about what Kodak's "goal" was. (Dkt. 116 at ¶ 110). In his interview with Yahoo News, he similarly made clear that all of

his predictions were conditional, stating he was "assuming that everything stays normal," that "[y]ou never know," and that he had "no idea" if there might be a "COVID-20" that would impact the anticipated plans. (*Id*. at ¶ 111). "[A]n investor could not have reasonably interpreted . . . [the] statement at issue as a guarantee rather than a prediction unless one chose to disregard the context in which the statement was made." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020). The predictions also were not supported by specific statements of fact that were false, nor is it a plausible reading of the consolidated class action complaint that Continenza did not genuinely or reasonably believe them when they were made.

Nor is the Court persuaded by Plaintiffs' contention that they can maintain a claim based on Kodak and Continenza's alleged failure to disclose the granting of the "spring-loaded" stock options.[2] For omissions to be independently actionable, they must involve

---

[2]    In their opposition papers, Plaintiffs argue that "Defendants Continenza's and Katz's stock purchases on June 23, 2020, endangered the loan because these trades were made while the Defendants were in possession of MNPI" and that "Defendant Karfunkel's 'gift' to Chemdas Yisroel, an organization of which Karfunkel was the President, was not pre-approved as required by the Company's policies," and that "[l]ike Defendants' failure to disclose the options grants, Defendants Continenza's and Katz's June stock purchases and Defendant Karfunkel's gift would have certainly raised flags in the course of the DFC's due diligence. Thus, they too endangered the loan, information that would have been material to investors." (Dkt. 173 at 38-39). However, the consolidated class action complaint is clear that the allegedly omitted information is that "less than twenty-four hours before announcing the LOI, during what should have been a black-out period for insider stock activity, and in violation of Kodak's Executive Compensation Policy, Defendants granted Kodak senior management, including Defendants Continenza, Byrd, and Bullwinkle, spring-loaded options that were designed to, and did, take advantage of the timing of the LOI announcement[.]" (Dkt. 116 at ¶ 83). Plaintiffs cannot introduce new claims in opposition to a motion to dismiss. *See Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008).

"a complete failure to make a statement. . . . [A] pure omission . . . is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Bos. Ret. Sys.*, 556 F. Supp. 3d at 119 (quotation and citation omitted) ("Pure omissions, of course, must be distinguished from half-truths—statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose." (quoting *In re Vivendi*, 838 F.3d at 239-40)).  In other words, "two kinds of omissions can be actionable under [§ 10b]:  first 'a material omission in contravention of an affirmative legal disclosure obligation,' and second 'a material omission of information that is necessary to prevent existing disclosures from being misleading.'"  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 308 (quoting *Litwin v. Blackstone Grp.*, LP, 634 F.3d 706, 715-16 (2d Cir. 2011)).

Plaintiffs have not viably pled that Defendants contravened an affirmative legal disclosure obligation, nor that Defendants omitted information necessary to prevent the statements at issue from being misleading.  As an initial matter, the Court has already

---

In any event, information regarding the June stock purchases had been publicly disclosed in SEC filings at the time they occurred.  (*See* Dkt. 159-27; Dkt. 159-28; Dkt. 159-29); *see also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) ("[O]n a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken, . . including the fact that press coverage or regulatory filings contained certain information, without regard to the truth of their contents. . . .  [T]he press articles and SEC filings here were offered only to show that information . . . was publicly available, not for the truth of the matters asserted therein." (citations, quotations, and original alteration omitted)).  The Court further notes that there is no allegation in the consolidated class action complaint that Continenza had advance knowledge of Karfunkel's gift to Chemdas Yisroel—which was allegedly made on July 29, 2020, and did not allegedly become public knowledge until August 11, 2020—such that he could have disclosed it in connection with the statements at issue.

concluded that Plaintiffs' assertion that Defendants were aware that their alleged misconduct would cause DFC to terminate the loan negotiations is speculative. "[W]here an outcome is merely speculative, the duty to disclose does not attach." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (finding no actionable omission where "[e]ven assuming *arguendo* that Defendants acted improperly, Plaintiff fail[ed] to plead that it was more than mere speculation that (1) the tender process would be investigated, and (2) that a potential investigation would result in the invalidation of the SASSA contract"). Even assuming that Defendants engaged in the misconduct alleged by Plaintiffs, at the time the statements at issue were made, Defendants were not aware that such misconduct would be (or would likely be) outcome-determinative with respect to the DFC loan. To the contrary, and as discussed above, the facts as alleged demonstrate that Defendants intended for the loan negotiations to continue and ultimately come to fruition.

Plaintiffs rely heavily on *In re Vivendi, S.A. Sec. Litig.*, in which the Second Circuit stated that "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." 838 F.3d at 240 (citation omitted); *see also Noto*, 35 F.4th at 105 ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). However, the duty to disclose unfavorable matters extends only to information that is "sufficiently connected to the existing disclosures that the omission of the [claimed misconduct] rendered those disclosures misleading." *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 166 (S.D.N.Y. 2018). Where there is no such connection, there is no viable claim based on the alleged omission.

*Id.*; *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 654 (S.D.N.Y. 2017) ("Plaintiff has failed to plead that that certification was false or misleading because . . . the amended complaint does not adequately allege a nexus between the alleged bribery schemes and Bradesco's financial condition or results of operations."). In other words, and as the Second Circuit has made clear, "disclosure is not a rite of confession" and making a statement about a topic "[does] not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding that topic." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98, 103 n.4 (2d Cir. 2021) (citations and quotations omitted). Here, the necessary connection between the granting of the stock options and the statements at issue does not exist.

Further, the Court agrees with Defendants that Plaintiffs have failed to adequately allege in the first instance that the granting of the stock options constituted misconduct. The Second Circuit has explained that "when a complaint claims that statements were rendered false or misleading through the non-disclosure of [misconduct], the facts of the underlying [misconduct] must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." *Gamm v. Sanderson Farms, Inc.,* 944 F.3d 455, 465 (2d Cir. 2019).[3] This is so because such an omission could

---

[3]     While *Gamm* dealt specifically with unlawful conduct, its rationale is equally applicable to misconduct that does not rise to the level of illegality. *See Mucha v. Winterkorn*, No. 21-1511-CV, 2022 WL 774877, at *3 (2d Cir. Mar. 15, 2022) ("Assuming *arguendo* that the Amended Complaint alleges that the challenged statements were false or misleading because Volkswagen was engaged in anticompetitive, as opposed to unlawful, conduct, the Amended Complaint still fails to meet Rule 9(b) and the PSLRA's heightened standards.").

be deemed material "only to the extent that [misconduct] actually occurred[.]" *Id*.  This reasoning applies with full force here—Plaintiffs' claims rest entirely on the theory that Defendants were "imperiling" the loan negotiations because they were engaging in "undisclosed self-dealing." (Dkt. 116 at ¶ 83).  Under Plaintiffs' own reasoning, then, if the grant of the stock options was proper (and thus could not reasonably have been expected to cause concern to DFC), failing to mention said grant could not have rendered the statements false or misleading.

Plaintiffs' allegations that the grant of the stock options was wrongful and a scheme to unjustly enrich Defendants fail to satisfy the applicable pleading standards.  Plaintiffs assert in an entirely conclusory fashion that the stock options were granted "during what should have been a black-out period for insider stock activity, and in violation of Kodak's Executive Compensation Policy[.]" (Dkt. 116 at ¶ 77).  Nowhere do Plaintiffs explain what terms of Kodak's Executive Compensation Policy were allegedly violated by the grant of the challenged stock options.  Further, they do not explain the basis for their assertion that there "should have been" a black-out period for insider stock activity during that time, nor do they detail who should have instituted such a black-out period, what its parameters should have been, or how the granting of the stock options at issue would have violated it.  The only non-conclusory factual allegation regarding the grant of the stock options is that it occurred "less than twenty-four hours before announcing the LOI" (*id*.), but without more, this is insufficient to support Plaintiffs' claims.

Plaintiffs have arguably alleged facts supporting the conclusion that the granting of the stock options reflected poor business judgment that ultimately cost Kodak a significant

opportunity.  However, "[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices, nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).  The question before the Court is whether Plaintiffs have alleged, with the requisite factual support, that the grant of the stock options was wrongful such that DFC's discovery thereof would have been expected by Defendants to completely scuttle the loan negotiations.  They have not, nor have they otherwise viably alleged any misstatements or omissions of material fact by Defendants.  Count I of the consolidated class action complaint accordingly must be dismissed.

## B.     Count II—Rule 10b-5(a) and (c)

The Court turns next to Plaintiffs' claim under Rule 10b-5(a) and (c), which provide for a "scheme liability" or "market manipulation" claim.  "To state a claim for market manipulation under § 10(b) and Rules 10b-5(a) and (c), a plaintiff must allege: (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Noto*, 35 F.4th at 106.  "Manipulation connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.  Accordingly, [t]he critical question [is] what activity 'artificially' affects a security's price in a deceptive manner.  A court must ask whether a defendant

injected inaccurate information into the marketplace." *Id.*; *see also In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *17 ("Along with proscribing material misstatements and omissions, subsections (a) and (c) of Rule 10b-5 prohibit schemes to defraud investors." (quotation and citation omitted)); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 534 ("Unlike a misrepresentation or omission claim under Rule 10b-5(b), scheme liability claim is aimed at 'inherently deceptive conduct' and does not require a misleading statement or omission.") (quotation and citation omitted)).

"In *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019), the Supreme Court explained that Rule 10b-5(a) and (c) 'capture a wide range of conduct,' and held that a disseminator of misstatements could be primarily liable for securities fraud under those subsections even if he did not make the fraudulent statements himself." *Bai v. Tegs Mgmt., LLC*, No. 20CV4942 (DLC), 2022 WL 602711, at *6 (S.D.N.Y. Mar. 1, 2022). "With respect to pleading requirements, '[b]ecause scheme liability does not require an allegation that the defendant made a statement, claims brought under Rule 10b-5(a) and (c) need not comport with Subsection (b)(1) of the PSLRA, which requires that a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief," but must comply with the requirements of Rule 9(b). *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 148 (S.D.N.Y. 2021). "Importantly, '[w]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant. A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b).'" *Id.* at 147 (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007)).

As an initial matter, the Court notes that Plaintiffs' counsel acknowledged at oral argument that the alleged making of false statements and omissions was a key part of the claimed scheme. Accordingly, the Court's conclusion that Plaintiffs have not sufficiently alleged that that any material false statements or omissions were made is also fatal to Plaintiffs' scheme liability claim. However, there are several other reasons why Count II must fail, which the Court sets forth below.

Defendants first argue that Plaintiffs' consolidated class action complaint does nothing more than rehash the same alleged misrepresentations and omissions as in their Rule 10b-5(b) claim and does not allege how or why the purported scheme was deceptive or manipulative. The Court agrees. As discussed in detail above, Plaintiffs have failed to allege with any particularity the manner in which the grant of the stock options to Continenza, Byrd, and Bullwinkle was allegedly deceptive or manipulative, but have instead asserted in a purely conclusory fashion that this conduct violated Kodak's internal policies. Further, while Plaintiffs argue that "Defendants' scheme further involved Continenza and Katz trading Kodak stock of suspicious timing and magnitude, and Karfunkel, without obtaining pre-approval as required, donating nearly half of his 6.3 million shares to his own so-called charity" (Dkt. 173 at 76), they have failed to explain how that alleged conduct supposedly constituted a scheme to manipulate the market. As the Court explained above, the June 2020 stock trades by Continenza and Katz occurred and were disclosed to the public outside the class period, and Karfunkel's donation is not alleged to have been known to or approved by any other defendant. Put simply, there is no coherent connection alleged between these discrete acts and the granting of the stock

options.  On these allegations, Plaintiffs have not "articulate[d] with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters*, 11 F.4th at 105.

Further, to succeed on a scheme liability claim, a "plaintiff must prove that [the] defendant committed an inherently deceptive or manipulative act that is independent from any alleged misstatement or omission." *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 450 (S.D.N.Y. 2019); *see also Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (misstatements and omissions alone cannot form the basis for a scheme liability claim); *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005) (same). Here, Plaintiffs have not alleged that the granting of stock options to Continenza, Byrd, and Bullwinkle was inherently a deceptive or manipulative act.  Instead, at oral argument, Plaintiffs' counsel attempted to distinguish this case law by contending that Plaintiffs are not asserting a "market manipulation" claim but only a "scheme liability" claim, and that accordingly no independent manipulative or deceptive act was required.  However, this argued distinction has no grounding in the case law.  The Second Circuit has been clear that "[t]o state a scheme liability claim, a plaintiff must show . . . that the defendant committed a deceptive or manipulative act" and that "[t]o maintain a 10b-5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed[.]" *Plumber & Steamfitters*, 11 F.4th at 105 (citations and quotations omitted).  In other words, whether denoted as "scheme liability" claim or a "market manipulation" claim, Count II can survive only if a deceptive or manipulative act—independent from the alleged misstatements or

omissions—occurred.  Plaintiffs have not alleged that this is the case, and so Count II must be dismissed.

### C.     Scienter and Loss Causation

In addition to the reasons discussed, Defendants also argue that Claims I and II fail because Plaintiffs have failed to plead a strong inference of scienter or loss causation. Because the Court has already determined for the reasons previously discussed that Claims I and II are subject to dismissal, it need not and does not reach these arguments.

### D.     Count III—Section 20(a) Claim Against Individual Defendants

In Count III, Plaintiffs allege that the individual defendants should be liable as control persons under Section 20(a) of the Exchange Act.  "Section 20(a) of the Exchange Act imposes liability on '[e]very person who, directly or indirectly, controls any person' directly liable under the Exchange Act."  *In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812, at *6 (quoting 15 U.S.C. § 78t(a)).  "To state a claim under § 20(a), a plaintiff must demonstrate, *inter alia*, a primary violation by the controlled person."  *Noto*, 35 F.4th at 107; *see also In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *18 ("To plead a section 20(a) claim, a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 750 F.3d 227, 236 (2d Cir. 2014)).  In addition, before making out a control person liability claim, a plaintiff must establish primary liability under Section 10(b).  *In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812, at *6.

Because the Court finds that Plaintiffs have not adequately pled primary violations in Count I and Count II, Claim III is subject to dismissal as a secondary violation. Accordingly, the Court grants Defendants' motion as to this claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted in its entirety. (Dkt. 159).  The Clerk of Court is directed to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 27, 2022
       Rochester, New York